Leta JASMANTAS, Plaintiff–Appellant,

v.

SUBARU-ISUZU AUTOMOTIVE,
INC., Defendant–Appellee.

No. 96–2918.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1997.

Decided March 26, 1998.

Barry A. Macey (argued), Nora L. Macey, Macey, Macey & Swanson, Indianapolis, IN, for Plaintiff–Appellant.

David D. Robinson, Wayne O. Adams, III (argued), Steven F. Pockrass, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, for Defendant–Appellee.

Charles B. Baldwin, Kenneth B. Siepman, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Amicus Curiae.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

In a companion case issued today, *Dalton v. Subaru–Isuzu Automotive, Inc.*, 7 A.D. Cases 1872 (7th Cir.1998), we describe the claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, of a number of individuals who worked at the Subaru–Isuzu Automotive, Inc. (SIA), plant in Lafayette, Indiana. Their claims all related to SIA's alleged failures to accommodate their disabilities. Their co-worker, Leta Jasmantas, also sued SIA, but she asserted that the company discharged her because of her disability or in retaliation for her act of filing charges with the Equal Employment Opportunity Commission (EEOC). The district court granted summary judgment for SIA on both her claims, which we hereby affirm.

## I

After three years of working in SIA's Paint section, in September of 1992, Jasmantas was transferred to the Black and Wax section. In her new position, Jasmantas was required to inject rust-preventing wax into cars passing overhead on the assembly line. By November 1992, she had developed numbness in her fingers and pain in her arm and shoulder. She took some personal time off work, hoping that things would improve, but the pain and discomfort returned when she resumed work in a variety of positions in 1993. This led her to visit a doctor, who imposed permanent work restrictions calling for Jasmantas to work at her own pace and avoid rate production or repetitive jobs. SIA accordingly placed Jasmantas on disability leave. It soon brought her back to work, briefly assigning her to the Paint section before transferring her to the Supplier Quality Assurance (SQA) department in January 1994. In her new position in SQA, Jasmantas was supervised by Group Leader Bob Sellers. Jasmantas found Sellers to be hostile towards her and another disabled employee in the department. She reported that he "was always watching over [her] shoulder and insisting that [she] do all parts of the job without assistance." Former SIA employee Patricia Sheppard indicated that Sellers had complained to her about the company's placement of employees with restrictions in SQA, because he thought that they did not work as hard as temporary employees and were "nothing but trouble."

All this was a prelude to Jasmantas' more serious problems, which began on June 22, 1994. At that time, Jasmantas was trying to perform her job even though she had a sore back from an injury she had suffered the day before. To help her avoid aggravating the injury, other employees on the team were assisting her with some of the more physically demanding aspects of her work. Sellers did not approve, even though this type of teamwork had happened at least once before. He therefore approached Jasmantas and ordered her to go to the medical clinic. She went and was examined by SIA Medical Director, Dr. Warrick Barrett, who assigned her the following work restriction:

RESTRICTION: NO BENDING/TWISTING/SQUATTING/STOOPING/LIFTING—MAY DO UNLIMITED STANDING WORK. (If no placement available, should remain at bed rest for 2–3 days, then gradual/careful resumption of activity as tolerated.)

Since no jobs that were immediately available fit the bill, Jasmantas was sent home.

For three days, Jasmantas rested in bed as Dr. Barrett had ordered. On Sunday, June 26, she spent (at most) 30 minutes pruning and trimming the bushes in her yard. Some of this work involved bending and stooping. This activity did not cause her undue discomfort, and she believed that it was consistent with her medical restrictions, which permitted a gradual resumption of activity "as tolerated." Unbeknownst to Jasmantas, however, SIA's suspicions about her truthfulness in reporting injuries had been aroused earlier, when another doctor had expressed concern about her. SIA therefore dispatched private investigators to her home to see if she was telling the truth this time. Using a telephoto lens, the investigators photographed Jasmantas while she worked in the yard. When Carolyn Thurton, the Senior Case Manager for SIA's worker's compensation claims, saw the photos, she telephoned Jasmantas to interview her. Thurton, with Jasmantas' knowledge and consent, tape recorded the conversation. When Thurton asked Jasmantas if she had stayed within the medical restrictions imposed by Dr. Barrett, Jasmantas replied "yes" and said that she was not involved in any outside activities, sports, or hobbies. Jasmantas also said that under her restrictions, she believed that she "was to gradually start increasing, resuming doing things," but that she was not getting very far.

On June 30, 1994, Jasmantas met with Dr. Barrett for a follow-up appointment. Jasmantas claimed that she told Dr. Barrett that she was feeling better, but that her back was stiff from the drive to the clinic. Dr. Barrett's report added that Jasmantas had also volunteered that she didn't "feel that she should begin doing any bending, twisting, squatting, stooping or lifting just yet for fear that it may aggravate her condition." After

his examination, Dr. Barrett recommended an additional seven days of bed rest. During that period, SIA's private investigators continued to photograph Jasmantas engaging in additional activities that appeared to be inconsistent with her medical restrictions and alleged injury.

Jasmantas returned to work on July 11, 1994. She was immediately called to a meeting with Bob Sellers, Mark Siwiec, Greg Smith, and one other representative of SIA management. Siwiec on an earlier occasion had disparagingly referred to disabled employees as "piece[s] of work," and Smith had tried to buy out the contract of one of the *Dalton* plaintiffs. At the meeting, the four questioned Jasmantas about her injury and about the photographs. They suspended her pending their final decision. On July 21, SIA terminated Jasmantas' employment on the ground that she had violated company policy by misrepresenting her work-related injury to them.

## II

As we noted above, Jasmantas asserts that SIA discharged her because of her disability or in retaliation for filing charges against the company with the EEOC. The district court granted summary judgment to SIA because, in its view, her discriminatory discharge claim failed because she was not a qualified individual under the ADA, and her retaliation claim failed because the evidence did not permit a reasonable inference that SIA's stated reasons for her discharge were pretextual. We agree that nothing shows that her discharge was either discriminatory or retaliatory in nature.

■ Contrary to what the district court held, we think that the evidence (if believed) could have shown that Jasmantas was a "qualified individual with a disability." She presented the Supplemental Declaration of expert witness Stephanie Archer in support of this part of her case. (We explain in *Dalton* that the district court did not abuse its discretion in allowing this into the record.) Archer opined that, because of her impairments, Jasmantas was precluded from performing 88% of the jobs in Tippecanoe County that she would otherwise have been able

to fill. Viewing this in the light most favorable to Jasmantas, there is an issue of fact on the question of her disability. There is similarly a question of fact as to whether Jasmantas was qualified for her former position. At the time of her discharge in 1994, she had been working in SQA for over six months. This is evidence that she was qualified for that position and that she met its prerequisites.

■ None of this helps her, however, because the district court was correct in its analysis of SIA's reasons for her discharge. Contrary to Jasmantas' arguments, nothing in the record directly establishes that SIA intended to discriminate against her because of her disabilities. See *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994). The fact that two SIA officials, Sellers and Siwiec, may have made disparaging remarks about disabled employees on several occasions is too remote from the circumstances of her termination to be helpful to her.

■ Jasmantas showed that she was in the protected class under the ADA and that she was qualified to do the job, but SIA articulated a powerful nondiscriminatory reason for its action: the photographs from its private investigators convinced the responsible SIA officials that Jasmantas was a malingerer and had been dishonest with the company about her injuries. Whether the SIA officials were right or wrong in that perception is neither here nor there. What is critical is that they believed this to be the case and took their action for this reason, rather than a discriminatory one. *Johnson v. Hondo, Inc.*, 125 F.3d 408, 415 (7th Cir.1997). None of the evidence to which Jasmantas points undercuts the good faith of their belief at all, or otherwise tends to show that their stated reasons were either pretextual (a smokescreen for disability discrimination) or retaliatory. Furthermore, with respect to the retaliation claim, Jasmantas filed her EEOC charge on April 4, 1994, and was discharged months later, on July 21, 1994. Without any other evidence linking her filing of the charge to her termination, and in the face of SIA's stated reasons for its action, SIA was entitled to summary judgment on this claim.

We therefore AFFIRM the judgment of the district court in Jasmantas' case.

EVANS, Circuit Judge, concurring.

I agree with Judge Wood that Ms. Jasmantas' discharge was neither discriminatory nor retaliatory in nature. I add, however, that I also agree with Judge Sharp in the district court: Jasmantas was not "disabled" under the ADA.