James **DALTON**, et al., Plaintiffs–Appellants,

v.

**SUBARU–ISUZU AUTOMOTIVE, INC.,** Defendant–Appellee.

Nos. 96–2865, 96–2920, 96–2938, 96–3006, 96–3046, 96–3047, 96–3107, 96–3163 and 96–3171.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1997.

Decided March 26, 1998.

Barry A. Macey (argued), Nora L. Macey, Macey, Macey & Swanson, Indianapolis, IN, for Plaintiffs–Appellants.

David D. Robinson, Wayne O. Adams, III (argued), Steven F. Pockrass, Johnson, Smith, Pence, Densborn, Wright & Heath, Indianapolis, IN, for Defendant–Appellee.

Charles B. Baldwin, Kenneth B. Siepman, Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for Amici Curiae Association of International Automobile Manufacturers, American Automobile Manufacturers Association, Incorporated.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Certain individuals who worked on the production floor at the Subaru–Isuzu Automotive, Inc. (SIA), plant in Lafayette, Indiana, all suffered injuries on the job—most of the repetitive stress type—that left them permanently disabled to varying degrees. An original group of sixteen of these employees brought suit against SIA under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, both as individuals and as putative class representatives. The district court denied class certification, however, and severed the individual cases, assigning separate docket numbers for each one. Each of the original plaintiffs now before us in these consolidated appeals was unsuccessful before the district court, which granted summary judgment in SIA's favor on their claims that SIA had failed to meet all of its duties to accommodate their respective disabilities under the ADA. We conclude that the district court ruled correctly in seven out of the nine cases, but we find that material disputed issues of fact existed with respect to two individuals, for whom a remand is therefore necessary. The claims of the tenth appellant in the consolidated appeals, Leta Jasmantas, are sufficiently distinct that we treat them in a separate opinion issued today. *Jasmantas v. Subaru–Isuzu Automotive, Inc.*, 139 F.3d 1155 (7th Cir. 1998).

## I

At its Lafayette facility, SIA manufactures both cars and trucks with a workforce of approximately 2,200 employees, of whom about 1,300–1,400 were production employees. All production employees at the plant have the job classification "Production Associate." With the exception of the Tool and Die positions in the Stamping department, there are no production associate jobs which require special training or skills; employees can move freely from one position to another within the plant. SIA uses a team concept with different work stations; each team member is expected to be able to rotate through all the work stations of her section (even though in practice partial, rather than full, rotation is the norm).

Although the record contains a fair amount of evidence that relates to the way in which SIA treated disabled employees generally—probably because plaintiffs were trying to obtain class certification at one point—at this point that evidence is relevant only insofar as it may throw light on SIA's treatment of the specific individual cases still before us. For example, SIA's Manager of Safety and Environmental Affairs, Mark Siwiec, frequently expressed a negative attitude toward disabled employees, calling them "piece[s] of work," showing skepticism about their injuries, and volunteering the opinion that SIA should get rid of everyone with permanent restrictions. There was also some debate over the background of SIA's program for disabled employees, as described in a November 1993 written policy statement. Even before that time, SIA had a light-duty program that was open only to employees suffering from temporary disabilities. The jobs in the program were temporary, normally lasting no longer than 90 days, and they carried with them a reduced wage.

This background information provides some context for the individual plaintiffs' cases. At this stage, however, it is the experience of the plaintiffs that is most important. We summarize each person's case briefly, beginning with the two whose cases must be remanded, and then moving to the remaining seven for whom summary judgment was proper.

### 1. *James Dalton (No. 96–2865)*

Dalton began working for SIA as a production associate in the Trim and Final section of the plant in July 1990. In that position, he

was expected to rotate through the eight different work stations assigned to his team. In practice, team members usually did move from one station to the next, but occasionally management would freeze the rotation schedule and assign each team member to his or her best station. Dalton's problems began in February 1991 when he suffered a neck and shoulder injury. He was able to continue working with a combination of some temporary movement restrictions and certain work station modifications. In March he strained his back, for which he received physical therapy. By April 5, 1991, the combination of his back and shoulder problems led SIA to conclude that he was not then physically capable of performing his duties in the Trim and Final section. It placed him temporarily in a modified position in the In Process Control (IPC) section.

Things went from bad to worse for Dalton, when by late April he had been diagnosed with disc herniation in his lower spine and bulging discs in his cervical spine. Back surgery in October 1991 alleviated some of those problems, but the back and neck pains continued. Through much of this time, he was on a worker's compensation leave of absence. In April 1992, SIA placed Dalton in a "work hardening" program, which it used to help employees with temporary disabilities get back in shape for work. His pains continued, which prompted the SIA medical clinic to impose permanent restrictions on all overhead work, on tasks requiring repetitive upward gazing, and on repetitive neck rotation. SIA placed him on short-term disability leave on July 14, 1992.

While he was on disability leave, Dalton contacted SIA on a regular basis to ask about returning to work. On each occasion, SIA Human Resource department employee Wally Brown informed him that there were no openings. Dalton also reported meeting with Employment and Staffing Manager Greg Smith. Dalton suggested to Smith that he could return to work with his former production team if SIA provided him with a step stool. Smith responded negatively, voicing the concern that a stool would present a safety hazard. Dalton then suggested that the stool could be fitted with a guard rail;

Smith never responded to that proposal. Dalton ultimately filed charges of discrimination in violation of the ADA with the Equal Employment Opportunity Commission (EEOC) in July 1993. He was finally called back to work on October 26, 1993—a time frame that will become familiar as we review the remaining job histories. Importantly, the record indicates that Dalton and his co-workers were still disabled when they were recalled; SIA had simply found a way by that time to accommodate their needs.

### 2. *Arnold Rainwater (No. 96–3171)*

Rainwater started his career with SIA in June 1990 as a production associate in the Body section. His work with the Cab Main Truck Side team required him to weld various parts of the trucks on the assembly line. The repeated welding soon led to carpal tunnel syndrome in both hands, however, and in March 1991 Rainwater underwent surgery to correct the problem. After the surgery, he received permanent restrictions on excessive extension and flexion of his right wrist and on excessive exposure of his right hand to vibratory trauma. At that point, SIA placed him on short-term disability leave.

On September 17, 1991, Rainwater returned to a position with the Materials Handling section. Working as part of a team of seven, Rainwater was expected to unload delivery trucks and transport automobile parts to the assembly line. Early in 1992 he seriously injured his shoulder while removing a bucket of parts from an overhead rack. He visited the company doctor, who placed him on worker's compensation leave to recuperate from his injury. After a series of unsuccessful attempts to return to his Materials Handling position, Rainwater received permanent movement restrictions designed to help his shoulder on September 28, 1992 (*e.g.*, no work above chest level with his right hand, no repetitive right shoulder movements). SIA then put him back on disability leave. Like Dalton, Rainwater told Wally Brown that he could return to his Materials Handling position if SIA gave him a step stool to assist in reaching parts stored on racks. SIA refused to follow up, reasoning that this activity would still violate his re-

strictions on repetitive motion. Rainwater disagreed, noting that he had previously lifted under the same repetitive motion restriction without incident. He also noted that he could have performed at least the three driving duties that were part of his former position. SIA returned Rainwater to work on October 26, 1993—the same day it restored Dalton to working status.

### 3. *Jimmy Edwards (No. 96–2920)*

Edwards began working for SIA in February 1990. After two years in the Trim and Final section, he developed both carpal (wrist) and cubital (elbow) tunnel syndrome. He had two rounds of surgery, one in April 1992 and the other in September 1992, to relieve some of the symptoms. Before Edwards underwent his second operation, the Trim and Final manager suggested that he look for a new line of work, because he could no longer do the work at SIA. Despite that pessimistic prediction, Edwards returned to work in November 1992 with temporary restrictions on the use of his right hand. The restrictions do not seem to have meant much, however, because Edwards wound up in the most physically demanding position on the production team. He worked there until January 1993, when he suffered a mild heart attack.

The heart problem resulted in a second round of leave. Edwards had heart surgery in February 1993, and additional right-arm surgery in April 1993 to relieve the carpal tunnel symptoms. He began to prepare to return to work without any restrictions in the summer of 1993, but SIA Clinic Manager Julie Ott was not certain he was ready. That prompted her to contact Edwards' personal doctor, who imposed on Edwards permanent restrictions on repetitive wrist movement, grasping, and certain types of lifting. SIA placed him on disability leave on August 3, 1993, informing him that it had no jobs that fit his restrictions. Edwards remained on leave until he was recalled to work on October 22, 1993.

### 4. *Billy Moncel (No. 96–2938)*

Beginning on September 5, 1989, Moncel worked in the Surface, Sand and Paint sec-

tion. After a year or so, he developed carpal tunnel syndrome in both hands; during the latter half of 1990 he also suffered back and shoulder injuries. The net result was a series of permanent restrictions on lifting more than 50 pounds, doing above-the-shoulder work, doing work requiring repetitive wrist motion, and twisting his torso, with each restriction taking effect at the latest in June 1991. Although Moncel was given his release to return to work in June 1991, SIA placed him on disability leave at that time, where he remained until October 4, 1993, when he returned to work. During the period that he was on leave, Moncel was aware of jobs held by temporary workers at SIA that he could have performed despite his restrictions. When he asked about them, however, SIA always informed him that there were no vacancies.

### 5. *Barbara Seamans (No. 96–3006)*

Seamans was another production associate in the Body section who began working for SIA in May 1990. Over the next two years, she suffered a variety of work-related injuries, including injuries to her right elbow (right cubital tunnel syndrome) and right shoulder. SIA responded by assigning her to a series of temporary restrictions and modified work assignments. Because of her persistent pain, SIA finally imposed permanent restrictions on Seamans relating to the use of her arms to engage in overhead activity, and it placed her on disability leave effective March 2, 1993. She contacted SIA about returning to work, but she too was informed each time that there were no openings compatible with her restrictions. She remained on leave until she was recalled to work on October 25, 1993.

### 6. *Cindy Michael (No. 96–3046)*

Like Seamans, Michael started work for SIA in mid–1990 in the Body section. In her job as a spot welder, she experienced recurring pain in her hands and elbows—ailments that were eventually diagnosed as including thoracic outlet syndrome, epicondylitis, bursitis, and tendinitis (March 1991), and lateral epicondylitis and right median nerve irritation (April 1991). After unsuccessful periods

of physical therapy and light-duty assignments with temporary work restrictions, Michael underwent surgery on her right elbow and forearm in June 1992. She returned briefly to work in October 1992, but the experiment was a failure, and she ultimately received permanent work restrictions on December 1, 1992, and was placed on disability leave. Her restrictions (by now familiar) involved prohibitions against working above chest level and against welding, and limitations on lifting.

During Cindy Michael's period of disability leave, her husband Jeffrey Michael (also an employee of SIA) remained at the facility. Jeffrey noticed that while Cindy was on leave, SIA brought in new temporary workers to fill positions in the IPC section of the plant. He was able to observe this because the new workers were stationed right next to his work area. In March 1993, Smith offered Cindy a lump sum buy-out to sever her employment with SIA, but she declined. SIA wrote to her in June asking about possible work and inviting her to contact the company if she had any ideas about positions she might fill, but she did not respond to its invitation. She was recalled to work on November 15, 1993, to a modified position in the Paint section. Thereafter, she moved to several other positions around the plant, the details of which are not important for our purposes.

### 7. *Marsha Wiley (No. 96–3047)*

Wiley began working for SIA on June 5, 1989, starting out in the Trim and Final section. By April 1992, she had developed carpal tunnel syndrome in both wrists and cubital tunnel syndrome in both elbows. After a brief period of worker's compensation leave, she returned to work, but the pain persisted, leading to wrist surgery in September 1992. Wiley resumed work at her former position after she recovered from the surgery.

A back injury in March 1993 again forced Wiley to resort to worker's compensation leave. When Wiley visited SIA's medical clinic on April 12, 1993, however, the doctor discovered that her wrist and elbow conditions had also deteriorated since she had returned to work. He therefore imposed permanent restrictions on repetitive wrist movements, repetitive grasping, and lifting in excess of 15 pounds, and she once again found herself placed on disability leave. Once on leave, Wiley began telephoning SIA Human Resources employee Brown on a monthly basis to inquire about returning to work. On each occasion, he informed Wiley that there were no available jobs that she could perform with her restrictions. SIA finally found a position for her on September 27, 1993, when it placed her in a modified position in the facility's Paint section.

### 8. *Beverlee Working (No. 96–3107)*

Like many of the other plaintiffs, Working signed on with SIA not long after the plant opened, in November 1989. As a production associate in SIA's Paint section, Working rotated through a variety of positions, including the controller position (a clerical position involving computer work) and several paint inspection and light touch-up positions. In January 1991, Working was diagnosed as having carpal tunnel syndrome. This led to temporary restrictions on repetitive wrist movements. SIA also assigned her to work exclusively at the controller position, a job she could do within those restrictions. Despite these adjustments, Working experienced no improvement in the condition of her hands, even though the measures apparently prevented further deterioration. Working had surgery on both wrists during the summer of 1991 and remained on worker's compensation leave until the year's end.

When she was ready to return to SIA in 1992, she went to the Black and Wax section, where (among other things) cars were treated with a rust-preventing wax. Because of her small stature, the work requirements of the new position—particularly the tasks that required her to work with cars passing overhead on the assembly line—led to additional injuries, forcing Working to return to worker's compensation leave within days of her return. Following her doctor's advice, she underwent a second surgical procedure in June 1992 and then remained on leave until the end of the year to recuperate.

In January 1993, Working completed SIA's "work hardening" program and was assigned permanent restrictions on repetitive use of impact tools, polishers, and trigger-activated devices. With these restrictions, Working could have performed all but one of the stations included in the rotation scheme of her former Paint section position. Instead, however, SIA assigned her to work in the sealing area at a position that required the use of a trigger-activated air gun. Within seven days, the pain in her hands once again forced Working to return to worker's compensation leave and then to move to a light-duty assignment.

After a brief period of confusion over the question whether Working's injuries were new or a recurrence of her older ones, SIA decided in February 1993 that her carpal tunnel problems had simply resurfaced. It therefore removed her from her light duty job, for which her "recurring injury" status made her ineligible under SIA's policies, and instead placed her on disability leave effective March 2, 1993. She received revised permanent restrictions on using impact tools and trigger-activated devices, lifting in excess of five pounds, and repetitive wrist movements. While on leave, Working contacted Brown and Smith about returning to work, but she too was informed that no jobs were available. SIA finally called her back on October 25, 1993.

### 9. *Bruce Stocker (No. 96–3163)*

Stocker began his career at SIA in the Trim and Final section in the Chassis 4 area of the plant. He initially worked at all seven stations in his section, but SIA decided to discontinue the rotation method in his area during 1991. Like the other plaintiffs, he began to experience pain in his hands and shoulders; at the end of 1991, he was diagnosed with thoracic strain (a back ailment) and was transferred to the Chassis 3 subline. There he worked two of the eight stations; elbow pain followed not far behind. In March 1992 he was diagnosed first with cubital tunnel syndrome and later with carpal tunnel syndrome, and he received temporary restrictions and braces. He underwent surgery in April 1992 and was placed on a leave of absence.

During the summer of 1992, Stocker twice attempted to return to work, but he was forced both times to return to worker's compensation leave because of the pain in his hands. A September 1992 placement in Final Assembly was also short-lived, because the repetitive grasping and pinching required in that part of the line aggravated his injuries. On October 2, 1992, Stocker received a permanent restriction on using vibratory tools and was placed on disability leave. A specialist later revised and expanded that restriction to include prohibitions against repetitive pulling, repetitive grasping, and lifting in excess of ten pounds with the right hand. The specialist also recommended that Stocker use an anti-vibratory glove. In spite of these added restrictions, Stocker asserted that he could have performed two of the non-rest positions on the Chassis 3 subline team; he claimed that his first tour of duty on that team had failed because his hands had not yet fully healed.

In January 1993, Stocker visited a hand specialist who recommended lifting all the restrictions except for the anti-vibratory glove. The SIA clinic personnel, however, disagreed with the new recommendation and refused to lift Stocker's restrictions. Stocker made further efforts to contact SIA Human Resources employees about returning to work, but to no avail until—once again—SIA called him back to work on October 25, 1993.

## II

Each of the plaintiffs in this appeal bases his or her claim on SIA's alleged failure reasonably to accommodate a disability, as required by the ADA. In *Best v. Shell Oil Co.*, 107 F.3d 544, 547–48 (7th Cir.1997), we held that in order to prevail on a failure to accommodate claim, the plaintiff must show (1) that he "was or is disabled" as defined by the ADA; (2) that the employer was aware of the disability; and (3) that the employee was qualified for the position in question, with or without the reasonable accommodations. The parties before us contest the first and third of these elements; it is undisputed that SIA was aware of each plaintiff's impair-

ments. We agree with the district court that each plaintiff came forward with enough evidence on the disability element to raise a genuine issue of fact.

Under the ADA, the term "disability" is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). As we have noted before, see, e.g., Best, 107 F.3d at 548; Roth v. Lutheran General Hosp., 57 F.3d 1446, 1454 (7th Cir.1995), a central concept for this definition is the idea of "major life activities." Not every physical or mental impairment "counts" for ADA purposes, because most disabilities from which people suffer (bad vision, impaired hearing, arthritic joints, diabetes) do not have a substantial enough effect on their major life activities. Those activities are defined in the regulations implementing the ADA as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. Pt. 1630, App. § 1630.2(i). There is no comprehensive list of such activities, but by way of example, the regulations suggest "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. See also Knapp v. Northwestern University, 101 F.3d 473, 478–82 (7th Cir.1996) (discussing major life activities within the context of the analogous Rehabilitation Act of 1973), cert. denied, —— U.S. ——, 117 S.Ct. 2454, 138 L.Ed.2d 212 (1997). It is not enough to show minor inconvenience; the statute specifically requires a plaintiff to show that he or she is "substantially limited" with respect to the activity in question. The regulations indicate that "an impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person." 29 C.F.R. Pt. 1630, App. § 1630.2(j).

While the evidence before us is inconclusive with respect to major life activities other than working, we think that all nine have shown enough of an effect on their ability to work to pass this test for summary judgment purposes. The plaintiffs relied on the Supplemental Declaration of Stephanie Archer, a vocational rehabilitation specialist retained by them. In its order of May 10, 1996, the district court had granted SIA's motion to strike Archer's initial affidavit, on the ground that it was too general to be useful. The affidavit did not compare the number of jobs the plaintiffs could do before and after the onset of their disabilities; it looked at the entire country instead of the region to which they might turn for jobs; and the time period for her statistics was left unclear. The plaintiffs returned with Archer's Supplemental Declaration, which the district court decided to admit under Fed. R.Evid. 702 and 705 and Fed.R.Civ.P. 56(e) in an order dated June 21, 1996. In the latter declaration, Archer narrowed her analysis to the jobs that might be available to the plaintiffs in Tippecanoe County, Indiana, where the plant is located; she evaluated the change in available jobs caused by each individual's disabilities; and she restricted the time period of her analysis to the years 1992–1995. SIA has argued that the district court abused its discretion in admitting the Supplemental Declaration, because it was served on the company more than a month after the day of the hearing on the summary judgment motion and it contained new information. While we appreciate SIA's frustration, the district court is in a far better position to judge whether late-filed evidence will disrupt the proceedings too much and to make any appropriate adjustments. We do not find that Judge Sharp abused his broad discretion in this instance; we therefore consider the case as he did—with the benefit of the Supplemental Declaration.

According to the EEOC's regulations, "[a]n individual is substantially limited in working if the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes," taking into account the relevant geographic area, the set of alternative jobs the individual's impairment disqualifies her from, and the relative "ability of the average person with comparable qualifications to per-

form those same jobs." 29 C.F.R. Pt. 1630, App. § 1630.2(j). Here we begin with SIA's own classification of the jobs. All employees with production responsibilities had the same job classification, "production associate," and SIA transferred them from one section of the plant to another without requiring prior training. (Its practice was to furnish whatever additional training a new location required after transfer.) For SIA, therefore, the "class of jobs" relevant to our analysis should include at a minimum all "production associate" positions.

As an alternative method of proof, the regulation permits a plaintiff to show that she is now substantially limited with respect to a broad range of jobs in various classes. The Archer Supplemental Declaration was more pertinent to the "broad range of jobs" method of proof than the "class of jobs" method. Archer explained that within the geographical area of Tippecanoe County, a "nondisabled high school graduate" would be able to perform approximately 21,200 jobs after receiving some training. Archer then explained, plaintiff by plaintiff, that their disabilities reduced their job prospects as follows:

| Plaintiff | Percent Reduction in Job Prospects for Tippecanoe County Jobs |
|---|---|
| Dalton | 69% |
| Rainwater | 70% |
| Edwards | 85% |
| Moncel | 65% |
| Seamans | 35% |
| Michael | 70% |
| Wiley | 72% |
| Working | 89% |
| Stocker | 80% |

Archer Supplemental Declaration, ¶ 9. A rational trier of fact could reasonably find that the substantial percentage reductions in the broad range of jobs available to these plaintiffs, coupled with their own testimony about the effect of their disabilities on their work as production associates, substantially limited them in the major life activity of working.

■ We turn then to the other disputed element: whether each plaintiff showed enough to prove he or she was qualified for ADA purposes. As we held in *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996), to determine whether an individual with a disability is "qualified" re-

quires one to answer two questions. "First, we consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.... If he does, then we must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Id.* (internal citations and quotations omitted). See also 29 C.F.R. Pt. 1630 App. § 1630.2(m) (establishing the two-step process summarized in *Bombard*). As a practical matter, the employer is entitled to define the job, in terms of both its essential scope and the qualifications required for it; the employer then must decide whether the employee meets those criteria.

The parties do not dispute that all of the plaintiffs possessed the prerequisites for the production associate positions they initially held. To the extent they were seeking to regain their former positions or the equivalent elsewhere in the plant, the same prerequisites were also present. Several employees, however, were also interested in the "light-duty" jobs SIA used for its temporarily disabled workers. Some of these jobs may not have been classified as "production associate" positions. In that case, the employees may have been seeking access to them as part of the employer's duty to offer a different position as a reasonable accommodation. We analyze that possibility below; here we conclude only that the plaintiffs satisfactorily demonstrated their qualifications apart from their disabilities for "production associate" positions; what remained was to show that they could actually perform the work, with or without accommodation.

In ADA cases involving actual disabilities, as opposed to perceived disabilities or a history of a disability, it is usually true that the plaintiff cannot perform the essential functions of the job without some kind of reasonable accommodation. (The opposite may often be true in the cases of perceived or historical disability; the plaintiff may be perfectly able to perform the job without any accommodation, and the only thing standing in the way may be the employer's preconceived notions of disability.) That at least is

the case here: none of the plaintiffs asserts that he or she could perform the essential functions of the job without any accommodation. Instead, they focus on what accommodations SIA reasonably should have been required to offer. The nine fall into two groups: first, those who had some evidence that they could perform their existing jobs with some work station modification, and second, those for whom the only possible accommodation was a transfer to a different job.

### 1. *Dalton and Rainwater*

■ Dalton and Rainwater are the only two plaintiffs who fall into the first class. In their efforts to return to work, both approached SIA officials and suggested possible workplace modifications that they believed would enable them to return to their former jobs. Dalton, in his affidavit, said that he informed Employment and Staffing Manager Greg Smith that he could return to work if he was provided with a step stool equipped with a guard rail. Rainwater suggested a similar accommodation to Human Resources employee Wally Brown. SIA took no action on either of these proposals; in both cases, rather than continuing to engage in the interactive process we have described, see *Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1012 (7th Cir.1997); *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996); see also 29 C.F.R. Pt. 1630, App. § 1630.2(*o*)(3), SIA dropped the ball.

■ Viewing the evidence in Dalton's and Rainwater's favor, as we must at this point, we believe that the district court erred when it dismissed their statements as self-serving. They did not say only that the proposed accommodation would have been enough in their private opinions; they testified that they notified a responsible company official in some detail about a concrete plan, and they received no response. Smith and Brown may testify differently, of course, and it would be up to a jury to decide who was telling the truth. SIA in all probability would have more to say about the feasibility of the proposed accommodations. But it did not see fit to explain its reservations (if any) to the employees at the time, and a trier of fact might believe that it was not making the required efforts on their behalf. A trier of fact might also be impressed that, by some odd coincidence, all nine of these employees were called back to work for SIA between September 27, 1993 (Wiley), and November 23, 1993 (Michael) (around the time ADA charges were beginning to accumulate), even though their cases were otherwise entirely unrelated. In short, we see enough here to allow Dalton's and Rainwater's cases to go forward.

### 2. *Edwards, Moncel, Seamans, Michael, Wiley, Working, and Stocker*

The remaining seven plaintiffs (Edwards, Moncel, Seamans, Michael, Wiley, Working, and Stocker) all claimed that SIA's duty reasonably to accommodate them encompassed a duty to reassign them to other positions in the facility. SIA violated the ADA, they assert, by failing to do so. Most of the positions to which they refer were various light-duty jobs and positions staffed by temporary workers that the plaintiffs could have done despite their respective disabilities.

It is well established that under the ADA, the employer's duty reasonably to accommodate a disabled employee includes reassignment of the employee to a vacant position for which she is qualified. See 42 U.S.C. § 12111(9)(B). The option of reassignment is particularly important when the employee is unable to perform the essential functions of his or her current job, either with or without accommodation or when accommodation would pose an undue hardship for the employer. See 29 C.F.R. Pt. 1630, App. § 1630.2(*o*). The universe of jobs to which the employer must look when it considers reassignment to a vacant position is not, however, defined in the statute or the regulations. Nor have we had occasion in the past to define this with any precision, although we have confirmed that the ADA places a duty on the employer to "ascertain whether he has some job that the employee might be able to fill." *Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 487 (7th Cir.1997). See also *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir.1996) (Cudahy, J., and Rovner, J., concurring) (noting that "in an appropri-

ate case, the ADA may require the employer to transfer the employee to another available job for which he or she is qualified"); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir.1996) ("the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position").

■ We have already recognized some limitations on the employer's duty to reassign. For example, in *Gile* we held that an employer has no duty to "bump" an incumbent from a position just to accommodate the request of a disabled employee. *Gile*, 95 F.3d at 499. SIA has argued that the duty to reassign is further limited to cover only those positions that share the same essential functions as the employee's current position—that is, those that are practically identical with the present job. We find this reading of the statute too limited. Nevertheless, we agree with SIA that the duty to reassign does not extend in every ADA case to virtually every other job in a company, from the president to the janitors. Nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining job qualifications, prerequisites, and entitlements to intra-company transfers. See, e.g., *Cochrum*, 102 F.3d at 912–13 (employer not required to violate the provisions of a collective bargaining agreement to reassign a disabled employee pursuant to the ADA), citing *Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1051 (7th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1318, 137 L.Ed.2d 480 (1997); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998) (even if there were no CBA in place, the ADA does not require an employer to reassign in violation of a bona fide seniority system). See also *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 79, 97 S.Ct. 2264, 2274, 53 L.Ed.2d 113 (1977) ("We agree that neither a collective bargaining contract nor a seniority system may be employed to violate a statute, but we do not believe that the duty to accommodate [under Title VII] requires TWA to take steps inconsistent with the otherwise valid agreement.").

■ If the class of jobs to which an employer must turn is broader than those that share the identical "essential functions" of the present job, but narrower than the entire range of jobs in a company, then how should it be defined? The ADA itself tells us that it encompasses reassignment to a vacant position for which the employee is "qualified." See 42 U.S.C. § 12111(9)(B). In our view, in order to be considered "qualified" for the potential new position, the individual must again (1) satisfy the legitimate prerequisites for that alternative position, and (2) be able to perform the essential functions of that position with or without reasonable accommodations. See *Bombard*, 92 F.3d at 563. In order to avoid an infinite regression on the accommodation issue, however, in this context the term logically cannot include transfer to yet a third job. All such jobs must be considered at the same time, as possible accommodations for the employee whose disability prevents her from performing her first job.

■ The employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations. The employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion. See 29 C.F.R. § 1630.2(j)(3)(ii)(C) (defining "broad range of jobs in various classes"); 29 C.F.R. Pt. 1630, App. § 1630.2(*o*). The critical factor is the match between the employee's knowledge, skills, and abilities, and the legitimate requirements for other positions with the employer; it is not whether those other positions look exactly like the job the employee's disability prevents him or her from performing. This interpretation is consistent with the language from the House Report on the bill that became the ADA, to which we referred in *Gile*, 95 F.3d at 498:

If an employee, because of his disability, can no longer perform the essential functions of the job that he or she has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and the employer from losing a valuable worker.

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. (1990), U.S.Code Cong. & Admin.News 1990, 267. It is also consistent with the overall structure of the ADA to look to the class of jobs or broad range of jobs that the employer might give to a person with the plaintiff's qualifications. *Cf.* 29 C.F.R. § 1630.2(j)(3)(ii)(B) (defining "class of jobs").

Courts have recognized a variety of legitimate job prerequisites that an employer may establish consistently with nondiscrimination laws. It is possible, for example, for an employer to consider someone either under-qualified or over-qualified for a particular job. See, *e.g., Senner v. Northcentral Technical College,* 113 F.3d 750, 756–57 (7th Cir. 1997) (over-qualification under the ADEA); *Jablonski v. Chas. Levy Circulating Co.,* 919 F.Supp. 298, 300 (N.D.Ill.1996) (under-qualified under the ADA); *EEOC v. Insurance Co. of North America,* 49 F.3d 1418, 1421 (9th Cir.1995) (over-qualified under the ADEA); *Stein v. National City Bank,* 942 F.2d 1062, 1066 (6th Cir.1991) (same); *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 193 (2d Cir.1991) (recognizing legitimacy of policy against "underemployment"). Similarly, an employer may also have a policy of preferring fulltime employees over part-time employees for internal transfers into vacant full-time positions, *Daugherty v. City of El Paso,* 56 F.3d 695, 699 (5th Cir.1995) (ADA), or it may enforce an "up-or-out" policy of the sort practiced by many universities, management consultancies, law firms, and other covered entities, under which employees who do not advance within the organization at a certain rate are terminated. See, *e.g., Griffin v. Michigan Dep't of Corrections,* 5 F.3d 186, 189 (6th Cir.1993) (Title VII); *Neal v. Honeywell, Inc.,* 958 F.Supp. 345, 347 (N.D.Ill.1997) (False Claims Act); *Chang v. University of Rhode Island,* 606 F.Supp. 1161, 1260 (D.R.I.1985) (Title VII); *Murnane v. American Airlines, Inc.,* 482 F.Supp. 135, 144–45 (D.D.C.1979) (ADEA). Or an employer might have a "non-demotion" policy under which employees are entitled, absent unacceptable job performance or business necessity, to remain with the company, but are not entitled to demotion if circumstances change. See, *e.g., Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1225 (11th Cir.1997) (ADA).

In fact, we have been unable to find a single ADA or Rehabilitation Act case in which an employer has been required to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer, see *Duckett,* 120 F.3d at 1225 (also failing to find such a case), and for good reason. The contrary rule would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees. An employer cannot, of course, convert its responsibility to look to a "broad range" of jobs into a "narrow band" simply by adopting a "no transfer" policy. Any such policy would remain subject to challenge both for any disparate impact it might impose on disabled employees, and for any unreasonable inflexibility in the face of a demand for reasonable adjustments to accommodate a disabled candidate for transfer. See 29 C.F.R. Pt. 1630, App. § 1630.10. See also *Matthews,* 128 F.3d at 1195–96. Rather, the "broad range" of jobs to which an employer must look when considering transfer as a reasonable accommodation for a disabled employee is bounded from above by the employer's freedom not to offer promotions and from below by its legitimate, nondiscriminatory limitations on lateral transfers and demotions.

The seven plaintiffs here argue that SIA had vacancies of two kinds during the relevant time period: first, it had vacancies in its light-duty program, and second, it used temporary workers to fill positions that they could equally have filled. We address the second argument first, because it is more straightforward. If any of the plaintiffs had been able to point to a particular job that

was filled by a temporary worker while a plaintiff was on disability leave, and then had been able to show that he or she could have done that job consistently with the relevant qualifications, summary judgment would have been wrong. But no one was able to do so. SIA's staffing reports indicate that at least some temporary workers were hired between 1992 and 1993—hardly surprising for an auto manufacturer. This evidence does not help the plaintiffs, however, without something in addition to indicate that they were qualified for these positions (both in the sense of personal qualifications and in the slightly different sense of satisfying the employer's legitimate prerequisites)—and there is none. To the extent that each plaintiff asserts that he or she was aware of positions occupied by temporary workers that the plaintiff could have done within his or her restrictions, this is also insufficient, because the record does not indicate exactly when SIA filled those positions. Even temporary workers do not have to be bumped out of a job, under our decision in *Gile,* unless the temporary worker was simply filling in for a particular person during an absence. (SIA permitted bumping in the latter case.) Thus, the fact that temporary workers held jobs while the plaintiffs were out of work does not win the day for them.

 The light-duty program raises somewhat more complex issues. There is no doubt that the plaintiffs were able to perform the essential functions of the jobs themselves. But they did not satisfy an important prerequisite SIA had established. This was a special program SIA had set up, designed to be coordinated with the Indiana Worker's Compensation Act, Ind.Code §§ 22–3–1–1, *et seq.,* that by definition is only available for those employees (disabled or otherwise) who are recuperating from recent injuries and whose disabilities are temporary. Employees may participate in the program for a maximum period of 90 days. If SIA's duty under the ADA to accommodate disabled persons requires it to offer these temporary-duty positions to its permanently disabled workforce in order to accommodate their permanent disabilities, the effect would be to abolish (in whole or in part) the temporary disability program, leaving nothing for that group of employees. There is, after all, a finite number of jobs at almost any plant that can be staffed for periods of less than three months by a continually changing group of people.

The ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside in conjunction with a program like the one contemplated by the state worker's compensation statute and to convert them to permanent positions for its disabled employees. The ADA does require that SIA make its light-duty program available to disabled employees who are recuperating from *temporary* restrictions and are otherwise qualified to participate. See 29 C.F.R. Pt. 1630, App. § 1630.9. But nothing here indicates that SIA failed to do that, and it was entitled to reserve a reasonable number of positions for this special purpose. To hold otherwise would be to require SIA to create new full-time positions to accommodate its disabled employees, a course of action not required under the ADA. See *McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1165 (7th Cir.1997) (citing *Gile,* 95 F.3d at 499). See also *Champ v. Baltimore County,* 884 F.Supp. 991, 1000 (D.Md.1995), *aff'd,* 91 F.3d 129 (4th Cir.1996); *Mengine v. Runyon,* 114 F.3d 415, 418–19 (3d Cir.1997); *Staub v. Boeing Co.,* 919 F.Supp. 366, 370 (W.D.Wash.1996); U.S. Equal Employment Opportunity Commission, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* ¶ 9–5 (1992) ("If the [light-duty] position was created as a temporary job, a reassignment to that position need only be for a temporary period.").

### III

We therefore find with respect to plaintiffs Edwards, Moncel, Seamans, Michael, Wiley, Working, and Stocker, that (1) the evidence was insufficient even for summary judgment purposes to show that there were vacant positions filled by temporary workers during the relevant time period to which they could have been reassigned, within the relevant class or broad range of jobs at SIA's facility, and (2) the plaintiffs failed to show that SIA's

decision to limit access to its light-duty program to employees with temporary disabilities was discriminatory. We AFFIRM the district court's judgment to SIA in their cases (Nos. 96–2920, 96–2938, 96–3006, 96–3046, 96–3047, 96–3107, and 96–3163). Because we find disputed issues of material facts in the cases of Dalton and Rainwater, we REVERSE AND REMAND the judgments in Nos. 96–2865 and 96–3171 for further proceedings.

EVANS, Circuit Judge, concurring.

I agree that the grant of summary judgment as to Dalton and Rainwater must be reversed because factual questions on both the disability and reasonable accommodation issues are present. As to the other claimants, I would uphold the grant of summary judgment not only because, as Judge Wood notes, they fail on the reasonable accommodation issue, but because they also are not "disabled" as that term is defined under the ADA. Most of these claimants have some variation of carpal tunnel syndrome (CTS), a physical impairment no doubt, but as my concurring opinion in our companion case (*DePaoli v. Abbott Laboratories*, 140 F.3d 668 (7th Cir.1998)) notes, more than a "physical impairment" is required before a finding of "disability" can be made under the ADA. Also, by holding that they are "disabled" under the Act, the majority creates a strange anomaly, for now a person with CTS who makes Subaru's in Lafayette, Indiana (population 43,674), is substantially limited in a major life activity while someone who makes Toyota's in Georgetown, Kentucky (population 11,414), is not. See *McKay v. Toyota Motor Manufacturing, U.S.A., Inc.*, 110 F.3d 369 (6th Cir.1997).