**UNITED STATES EQUAL EMPLOY-
MENT OPPORTUNITY COMMIS-
SION, et al., Plaintiffs,**

**v.**

**ROCKWELL INTERNATIONAL
CORPORATION, et al.,
Defendants.**

**No. 95 C 3824.**

United States District Court,
N.D. Illinois,
Eastern Division.

Aug. 13, 1999.

Jean Powers Kamp, Gordon G. Waldron, Mary B. Manzo, John C. Hendrickson, United States Equal Employment Opportunity Commission, Chicago, IL, Diane Ilene Smason, Equal Employment Opportunity Commission, Chicago, IL, for Equal Employment Opportunity Commission, The, United States, plaintiff.

Richard H. Schnadig, Nina G. Stillman, James Edwin Bayles, Jr., Thomas William Snyder, Vedder, Price, Kaufman & Kammholz, Chicago, IL, Valerie Depies Harper, City of Chicago, Law Department Corporation Counsel, Chicago, IL, for Rockwell International Corporation, defendant.

Marsha Ann Tolchin, Ungaretti & Harris, Chicago, IL, Thomas H. Williams, Jaffe, Raitt, Heuer & Weiss, Detroit, MI, for Cambridge Industries Inc., defendant.

Gail E. Mrozowski, Cornfield & Feldman, Chicago, IL, for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, defendant.

Barbara J. Hillman, Gail E. Mrozowski, Cornfield & Feldman, Chicago, IL, Gail E Mrozowski, Cornfield & Feldman, Chicago, IL, for Local 1766 United Automobile, Aerospace and Agricultural Implement Workers of America, defendant.

### MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

Plaintiff, United States Equal Employment Commission, on behalf of 72 named individuals ("Claimants"), has sued defendant Rockwell International Corporation, among others, alleging that defendant violated the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), by rejecting otherwise qualified work applicants based on an abnormal result on a pre-employment nerve conduction test of the median nerve. The 72 applicants were rejected in 1992 and 1993. Defendant has moved for summary judgment, arguing that plaintiff cannot establish that defendant regarded the Claimants as disabled within the meaning of the ADA. For the reasons set forth below defendant's motion is granted.

#### Facts[1]

Defendant's Centralia Illinois facility made plastic parts for automobiles, such as hoods, fenders, and tailgates. During 1992 and part of 1993, as part of its employment application process defendant administered a nerve conduction test to test susceptibility to certain conditions, the most common being carpal tunnel syndrome. An abnormal result on the test excluded applicants from certain entry level positions including trimmer, finisher, final finisher, assembler, RTM operator, molder and multi-operation positions. The first four positions made up over 90% of the persons hired at the Centralia facility between 1992 and 1995.

---

1. Although many of the underlying facts are actually disputed, for purposes of this motion only, defendant has accepted plaintiff's version of the facts.

Defendant has submitted evidence that it used the results of the test to reject individuals from only four jobs: trimmer, finisher, final finisher, and assembler, all of which defendant argues had a job description that required constant repetition *and* constant use of laboratory tools. In its position statement filed with the EEOC in 1993, however, defendant stated that it excluded applicants with abnormal nerve tests from various jobs because it believed that they "will develop carpal tunnel syndrome or cumulative trauma disorder if subject to continuing motions *and/or* vibratory power tools." (Emphasis added). Plaintiff argues that the position statement demonstrates that defendant perceived Claimants as unable to perform a group of jobs requiring either constant repetition or constant use of laboratory tools. Defendant disputes this interpretation, but again has accepted plaintiff's position for purposes of the pending motion for summary judgment.

### Discussion

To invoke protection under the ADA, plaintiff must establish that the Claimants suffered from a disability as defined in the Act. *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir.1998). The ADA defines disability as: a) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; b) a record of such impairment; or c) being regarded as having such an impairment. 42 U.S.C. §§ 12102(2).

In the instant case, it is undisputed that none of the Claimants actually suffered from or had a record of any impairment that substantially limited one or more of the major life activities. Therefore, the sole issue is whether defendant regarded Claimants as having such an impairment when it rejected their employment applications based on the abnormal nerve conduction test result.

To establish that defendant discriminated against Claimants by rejecting them based on the nerve conduction testing program, plaintiff must establish that defendant perceived or regarded Claimants as having an impairment that substantially limited them in a major life activity. The only major life activity from which plaintiff claims defendant perceived Claimants as limited is working. In this context, "substantially limited" means "significantly restricts the ability to perform a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i); *Weiler v. Household Finance Corp.*, 101 F.3d 519, 525 (7th Cir.1996). As the Seventh Circuit has made clear, "an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work; rather, the impairment must substantially limit employment generally." *Skorup*, 153 F.3d at 514–15. "Section 12102(2)(A) looks for proof beyond the plaintiff's inability to satisfy the expectations of a single employer; to be 'substantial,' a limitation on the ability to work must be one that affects the plaintiff's ability to perform a class or range of jobs before it qualifies as a disabling limitation under the ADA. For purposes of § 12102(2)(C), the employer's perception of the plaintiff's inability to work must have a comparable breadth." *Id.* at 515. Therefore, to defeat defendant's motion for summary judgment, plaintiff must present some evidence establishing a genuine issue of material fact as to whether defendant perceived Claimants as being substantially limited from employment generally.

The EEOC regulations identify several factors the court "should consider when determining whether an individual is substantially limited in the major life activity of working, including the number and type of jobs utilizing similar training, knowledge, skills or abilities, within [the] geographical area [reasonably accessible to the individual], from which the individual is also disqualified." *Murphy v. United Parcel Service, Inc.*, —— U.S. ——, 119 S.Ct. 2133, 2138, —— L.Ed.2d —— (1999) (quoting 29 C.F.R. 1630.2(j)(3)(ii)(B).)

To establish that defendant perceived Claimants as substantially limited from employment generally, plaintiff relies almost exclusively on the report of Michael Brethauer, a vocational counselor. Brethauer opines that defendant's perception of Claimants, which he describes as the inability to work in occupations that involve "continuing repetitive motions and/or vibratory power tools," resulted in a substantial loss of each Claimants' access to the relevant labor market. To reach this opinion Brethauer first estimated the number of occupations each claimant could perform based on his job history and education (the "original access number"). He did this by retrieving information from the Dictionary of Occupational Titles ("DOT") about the training and skills required of other occupations. He then determined a lesser number (the "adjusted access number") that would be available to each claimant if he/she was regarded as unable to perform jobs that require "continuing repetitive motions and/or vibratory power tools." He then calculated the percentage reduction between those two numbers.

### Defendant's Challenge of Plaintiff's Vocational Expert

Defendant has challenged Brethauer's report as inadmissible under Fed.R.Evid. 702, 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendant does not challenge Brethauer's qualifications as a vocational expert, but rather the report itself as "replete with assumptions that bear no relation to the facts in the record, methodologically flawed on several levels, and relying on facts and data which no expert in his field, or any other, would rely." [2]

The admissibility of expert testimony is governed by Fed.R.Evid. 702, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or deter-

mine the fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert*, the Court held that Rule 702 imposes a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. Recently, in *Kumho Tire Co. Limited v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court held that this basic gatekeeping obligation applies to all expert testimony, not just scientific testimony.

■ The Seventh Circuit has interpreted *Daubert* as requiring a district court to conduct a two-step analysis when expert testimony is proffered. *United States v. Hall*, 165 F.3d 1095, 1101 (7th Cir.1999). First, the court must "consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation." *Id.* (citing *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir.1993).) This step requires the court to determine "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id.* The purpose is to ensure that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho*, 119 S.Ct. at 1176.

The second step requires the court to "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact." *Hall*, 165 F.3d at 1101–02. This step requires a determination that the proposed testimony fits the issue to which the expert is testifying. *Id.* In simple terms, the second step requires the court to determine if the testimony is relevant, for

**2.** The court has held a *"Daubert"* evidentiary hearing and heard oral argument on the *Dau-*bert and summary judgment motions.

"[e]xpert testimony which does not relate to an issue in the case is not relevant and, ergo nonhelpful." *Porter*, 9 F.3d at 613.

Defendant argues that Brethauer's testimony and report fails under both steps. First, defendant argues that Brethauer's testimony is unreliable because he has failed to adhere to the same standards of intellectual rigor demanded in his professional work. Defendant questions the reliability of Brethauer's testimony on a number of bases. For example, Brethauer acknowledges that it is important for a vocational expert to know the medical history of the individuals about whom he is testifying. He has even coauthored an article on the importance of such knowledge. He admits, however, that he did not review the Claimants' medical histories in the instant case, nor even request such information from plaintiff. He testified that he simply assumed that no Claimant had any medical condition that would impact employability. Yet, he knew this not to be the case for at least one Claimant with whom he had worked previously as a vocational counselor.

Defendant also challenges Brethauer's failure to review the Claimants' individual depositions. Although Brethauer admits he reviewed the full depositions of all of the claimants in a related case, he received only excerpts of the depositions of the individual Claimants in the instant case. Brethauer did not choose the particular Claimants or the particular excerpts of each deposition. They were chosen by plaintiff's counsel. Thus, Brethauer's sole source of information about the individual Claimants in the instant case comes from summaries prepared by one of the litigants. He admits that he found some of the data incomplete, but failed to follow up with plaintiff. He did tell plaintiff that he preferred to review the entire depositions, but acquiesced to plaintiff's decision to use its own paralegals to provide excerpts in order to save money. Defendant argues that this violates both Fed.R.Evid. 702 and 703, because Brethauer admits that he relied on data not usually relied upon by experts in the field, including himself. De-

fendant has presented several other attacks on the reliability of Brethauer's report and testimony. Just as an example, Brethauer admits that he failed to take into account specific educational courses taken by individual Claimants despite the fact that such education is something he would normally consider.

Even more serious than Brethauer's admissions that he did not consistently follow his own preferred methods, however, is the amount of input that plaintiff actually had into Brethauer's reports. In Brethauer's original report he stated that he had reviewed the preliminary report of Dr. Arun Garg, plaintiff's expert ergonomist, relating to the various jobs at the Centralia facility. In fact, however, Brethauer did not actually see Dr. Garg's report until after Brethauer had already signed and submitted his own report in August of 1998. Brethauer's attempt to rehabilitate himself by testifying that he thought that the preliminary report consisted entirely of a conference call between himself, Dr. Garg, and plaintiff's counsel Gordon Waldron is unavailing in light of Brethauer's admission that he included the reference to Garg's report only at Waldron's request, and that Waldron provided the specific language to be included. Brethauer's initial draft of his original report contained no reference to Dr. Garg's materials because Brethauer believed and still believes that the materials were unnecessary and unrelated to his conclusions.

Additionally, at page 10 of Brethauer's amended report he included an analysis of ergonomic data supplied by defendant's expert ergonomist Michael Smith. Brethauer admitted, however, that he did not prepare the chart on page 10 and, at the time he issued his own report or even later at his own deposition, he did not know to what the calculations in the chart related or from where the data came. Indeed, Brethauer admitted that prior to the instant case he had never included an analysis of an ergonomist's report in his own analysis, and had never even seen an ergo-

nomist report prior to receiving portions of Garg's and Smith's reports from Waldron. Another, although perhaps less severe example of Brethauer's willingness to blindly accept and include material from Waldron is found in the amended report references to Brethauer's deposition. Brethauer admitted that every reference to his own deposition contained in his amended report was supplied by plaintiff's counsel and that he had not even read his own deposition transcript.

Defendant also argues that Brethauer failed to follow the methodology he stated he followed in his report. In his original report Brethauer stated that he determined the original access to the labor market by restricting his analysis to occupations including similar work fields, and similar materials, products, subject matter or services ("MPSMS"). At his deposition, Brethauer testified that he did not actually follow MPSMS because he included entry level jobs in the original access figures. Brethauer admitted that had he followed MTSMS the original access figures would have gone down, reducing the spread between the original access numbers and the adjusted access numbers. Brethauer tried to explain this discrepancy by stating that he simply forgot that his computer program automatically listed entry level jobs. He later changed that testimony, however, stating that he always intended to include entry level jobs and that the oversight was not so stating in his original report.

Additionally, in his original report Brethauer stated that he excluded from the adjusted access numbers occupational titles involving the "temperament of repetition." By doing so, however, he admits that he excluded jobs that required no upper extremity repetition. He testified that he still believes that it is appropriate to exclude jobs with the temperament of repetition, but nonetheless included in his second report a calculation dropping this exclusion because plaintiff's counsel insisted that he do so. As defendant points out, the inclusion of the second set of calculations is effectively irrelevant because Brethauer testified that in his professional opinion excluding the temperament of repetition is appropriate. Therefore, inclusion of the second set of calculations, at plaintiff's counsel's insistence, was inconsistent with Brethauer's professional approach.

Defendant also challenges Brethauer's treatment as irrelevant any specialized certifications, such as a commercial driver's license, and any of the Claimants' actual vocational training unless it appeared in the Claimants' actual work history. Brethauer then excluded jobs in a Claimant's' vocational history if he believed the Claimant had not held the job for a sufficient period of time. Brethauer conceded on examination, however, that the fact that the job appeared on plaintiff's summaries of the Claimants' work histories indicated at least that the Claimant was proficient enough to obtain the job initially. Having admitted this, Brethauer could not supply a rational basis for excluding the job from the access figures.

In addition to challenging the reliability of Brethauer's testimony, defendant challenges its relevance under step two of the *Daubert* analysis. Defendant argues Brethauer's testimony is irrelevant because his calculations reflect Occupational Titles found in the DOT, and do not translate into actual numbers of jobs in the relevant labor market as required by 29 C.F.R. 1630.2(j)(3)(ii). Brethauer admitted that he made no adjustments to reflect the relevant labor market, but simply assumed, based on his experience, that the relevant market is "fairly representative of the national labor market." Relying on *Zarzycki v. United Technologies Corp.*, 30 F.Supp.2d 283 (D.Conn.1998), defendant argues that Brethauer's report is too general to be helpful to the jury. In *Zarzycki*, the court rejected as too general an expert vocational report because it: 1) did not take into consideration the specific job market in the geographical area to which the plaintiff had access; and 2) did not contain evidence relating to the approximate number of jobs from which the plaintiff would have been excluded because of

the impairment, but rather contained evidence of job titles from which the plaintiff might be excluded. "By analyzing job titles only, and without evidence on the number of jobs contained within each job title, no juror could make a reasonable conclusion on how Dr. Wiechetek's restrictions affect the number of jobs from which the plaintiff would be excluded due to his impairment. For instance, there could be 100 jobs or 100,000 jobs within each job title." *Id.* at 292.

Plaintiff's response to defendant's attack on Brethauer's report and testimony is overly simplistic and unpersuasive. First, plaintiff argues that the points raised by defendant affect only the weight to be given to the report, not its admissibility. Plaintiff argues that only the amended report is at issue, and that the amendments in the report were simply corrections of errors as required by Fed.R.Civ.P. 26(a)(1). These corrected errors, according to plaintiff, included the failure in Brethauer's first report to disclose that he had included entry level positions, and Brethauer's "mistaken misstatement" that he had previously seen the draft preliminary report of Dr. Garg. Other amendments between the first and second report, according to plaintiff simply make explicit Brethauer's underlying assumptions that he had already explained in his first deposition.

Plaintiff argues that the amended report refers, for the first time, to the Smith ergonomic report simply because Smith's report had not been produced by defendant at the time of Brethauer's original report and deposition. That does not explain, however, Brethauer's reference to ergonomics and ergonomic data when he testified that he did not understand the ergonomic data and that it had no effect at all on his report. Nor does it explain Brethauer's failure to verify figures given to him by attorney Waldron, or his inclusion in his report of information he did not think was relevant but was in fact insisted upon by Waldron. It is very clear from Waldron's statements at the June 26, 1999, hearing, and from Brethauer's own testimony, that Brethauer included in his report anything that Waldron requested, relied on reports prepared by Waldron, and even included specific wording supplied by Waldron.

■ Based on the evidence presented at the *Daubert* hearing and, in particular, his own admissions, the court concludes that Brethauer's report and testimony are inadmissible under Fed.R.Evid. 702 as interpreted by *Daubert*, and by Fed.R.Evid. 703. First, the report fails to meet the reliability requirements. Brethauer's testimony clearly established that he failed to follow the methodology and principles normally applied by vocational experts and that he himself normally applies when preforming his function as a vocational expert. It is obvious that Brethauer, who candidly admitted such at the *Daubert* hearing, was directed to employ principles that contradicted his normal methodology in various respects. He performed analyses he would not normally perform. He included analyses that he would not normally include. He included calculations on upon which he did not rely and did not fully believe should be followed. He relied on materials, reports and summaries given to him by counsel, and failed to verify the information from reliable, independent sources. Finally, he incorporated language drafted by Waldron. It is one thing for lawyers to make authorized revisions to an expert's prepared report. *See Marek v. Moore*, 171 F.R.D. 298 (D.Kan.1997). It is quite another for an expert to include calculations upon which he did not rely and he would not rely on simply to appease his client's attorney. A proffered expert must "bring to the jury more than the lawyers can offer in argument." *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir.1992). In short, Brethauer's own admissions demonstrate that he failed to employ the same level of intellectual rigor that characterizes the practice of experts in his field, or even his own normal practice.

■ Additionally, the court concludes that Brethauer's report, like the report in *Zarzycki*, is too general to be of use to the

jury. Like the expert in *Zarzycki*, Brethauer failed to take into account the specific job market in the geographical area to which the Claimants had access. Brethauer's report also fails to contain evidence on the approximate number of actual jobs from which the Claimants could be excluded because of the perceived impairment. Instead, Brethauer analyzed job titles contained in the DOT. Without any evidence of the number of jobs contained in each job title, Brethauer's report supplies no information from which a jury could determine the number of jobs from which the Claimants were considered excluded. Accordingly, the court holds that the report fails under *Daubert*'s relevancy requirement.

### Viability of Plaintiff's Case Without Its Expert

Even without Brethauer's report, plaintiff argues that it has presented sufficient evidence to establish that defendant perceived the Claimants as significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes. At oral argument, plaintiff's counsel proffered two reasons for denying summary judgment even without Brethauer's report. First is defendant's statement to the EEOC that it denied Claimant jobs that involved continuing repetitive motion and/or the use of vibratory power tools. The second is that defendant excluded Claimants from at least four job titles which defendant admits constituted 90% of hiring at the Centralia facility from 1992 through 1995. When questioned by the

court as to evidence in the record that would support a jury's conclusion that 90% of the jobs at defendant's plant translates to a sufficient number of jobs in the relevant geographical market to demonstrate that Claimants were perceived by defendant as substantially limited in employment generally, plaintiff had no response.[2] Indeed, absent Brethauer's report, plaintiff has presented no evidence that defendant's perception limited Claimants' ability to work generally.

Plaintiff has asserted in its brief and at oral argument that defendant, by its own statement, perceived Claimants as unable to perform continuous repetitive motion or use laboratory power tools, but "provides no evidence of the number of jobs from which [Claimants were perceived] as precluded because of the [perceived] impairment." *Skorup*, 153 F.3d at 515. To establish that the ADA applies to defendant's perception of Claimants, plaintiff must "identify what requirements posed by the class of assembly line jobs (or, alternatively, by a broad range of other jobs) were problematic in light of the limitations" imposed by defendant's perception. *Id.* "This is not an onerous requirement, but it does require at least some evidence from which one might infer that [Claimants] face significant restrictions in their ability to meet the requirements of other jobs." *Id.*

■ Plaintiff has presented no evidence of any jobs other than those at defendant's plant from which defendant's perception would have excluded Claimants. The fact

2. Plaintiff argues that the EEOC regulation states only that jobs in the local geographic area "may" be considered and, therefore, does not require evidence of the local market. Plaintiff then argues, however, that the court should consider the actual jobs from which the Claimants were excluded as demonstrating that defendant perceived claimants as significantly restricted from a class of jobs. The regulation actually provides that the court may consider "the job from which the individual has been disqualified ..., *and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is*

*also disqualified ...* (class of jobs)." 29 C.F.R. § 1630.2(j)(3)(ii) (emphasis added). Plaintiff cannot have it both ways. If it wants the court to consider the specific jobs at defendant's plant, plaintiff must also present evidence about similar jobs in the relevant market. Moreover, in *De Paoli v. Abbott Laboratories*, 140 F.3d 668, 673 (7th Cir.1998)—a case strongly relied on by plaintiff—the Seventh Circuit held that under the regulation, "we must look to the training, knowledge, skills and ability required to perform the particular work, *as well as the geographic area reasonably available to plaintiff.*" (Emphasis added).

that defendant's perception precluded Claimants from entry level positions at defendant's plant is, by itself, insufficient. Evidence of an inability to perform a particular job for a particular employer is not sufficient to establish a substantial limitation on the ability to work. The impairment must substantially limit employment generally. *Id.* at 514. While plaintiff is not required to establish a precise percentage of jobs that defendant's perception would have precluded Claimants from performing, plaintiff "has not set forth any evidence from which we can determine even general guideposts, such as whether [the perceived] impairment forecloses [Claimants] from accepting a few, many, or most of the jobs in a particular class or in a broad range of classes." *Id.*

Plaintiff argues that *DePaoli v. Abbott Laboratories,* 140 F.3d 668, 673 (7th Cir. 1998), holds that "any assembly line jobs that require repetitive movement" constitutes a broad range of jobs as a matter of law. In fact, the court merely stated that virtually any assembly line job that required repetitive movement would constitute a wide group of jobs in the Chicago area economy. It then stated that absent other problems with the plaintiff's case, it would have remanded the case to the district court for a determination of what class of jobs the plaintiff could no longer perform—an issue that apparently had not been developed in the record in that case. *Id.* In the instant case, defendant's motion for summary judgment put plaintiff to the proof that was contemplated by the *DePaoli* court. Plaintiff, however, has failed to produce evidence of what jobs the perceived impairment would have precluded Claimants from performing aside from the jobs at defendant's facility. Therefore, plaintiff is reduced to arguing that Claimants were perceived as unable to perform all assembly line jobs, but there is no evidence in the record of how many assembly line jobs in the relevant market required repetitive movement or the use of vibratory power tools.

Moreover, in reaching its conclusion, the *DePaoli* court relied on *Webb v. Garelick Manufacturing Co.,* 94 F.3d 484 (8th Cir. 1996), in which the court reversed a grant of summary judgment for the defendant and remanded to the district court for an "individualized assessment of the extent to which [the plaintiff's] hand condition limited his meaningful opportunities for employment." *Id.* at 488. The court further held that the district court should have determined what class of jobs was relevant for its disability analysis with respect to the plaintiff, taking into consideration the type of job from which the plaintiff was terminated and the special skills that he developed in his 24 years with the defendant. It is plaintiff's burden to present evidence from which the court can make such a determination. Plaintiff has completely failed to do so, arguing simply that being regarded as unable to perform continuous repetitive motion or use vibratory power tools is sufficient. It is not.

█ Plaintiff has presented no evidence of the kinds or number of jobs having such requirements, either within the relevant geographic area or even more generally. Therefore, there is simply no evidence from which a jury could conclude that Claimants were precluded from a class of jobs or a broad range of jobs, under the *DePaoli* analysis or otherwise. Absent such evidence, plaintiff cannot establish that Claimants were disabled within the meaning of the ADA.

The court reaches this conclusion reluctantly. It is quite possible that plaintiff could have produced evidence that defendant's perception of the claimants' disabilities precluded them from a broad range of jobs in the relevant market. It is also possible that the deficiencies in the Brethauer report—not to mention the impermissible input into that report by plaintiff's counsel—indicates a lack of such evidence. The point remains that a trier of fact must base its decision on evidence, not on intuition or possibilities. Summary judgment cannot be avoided by mere speculation. *Anderson v. Stauffer Chem. Co.,* 965 F.2d 397, 402 (7th Cir.1992). As the record

stands in this case, for plaintiff to prevail the jury would have to infer that there were a sufficient number of jobs in the relevant market requiring repetitive movement or the use of vibratory tools based on intuition or supposition, not evidence. Plaintiff had ample opportunity to develop the record, but failed to do so, compelling the entry of summary judgment for defendant.[3]

### Conclusion

For the reasons set forth above, defendant's motion for summary judgment is granted.

3.  There is no evidence in the record to support plaintiff's half-hearted argument that defendant rejected Claimants in part because it believed that hiring them would increase its worker's compensation costs. At most, the record indicates that defendant identified the positions most susceptible to cumulative trauma injuries by reviewing worker's compensation claim files. Unlike in *Riemer v. Illinois Dept. of Trans.*, 148 F.3d 800, 807 (7th Cir. 1998), in which the employer admitted making hiring decisions based in part on potential worker's compensation claims, there is no evidence in the record that defendant implemented its nerve conduction testing program as a means to avoid worker's compensation costs.