**Janet M. DePAOLI, Plaintiff–Appellant,**

v.

**ABBOTT LABORATORIES,**
**Defendant–Appellee.**

No. 96–2958.

United States Court of Appeals,
Seventh Circuit.

Argued April 16, 1997.

Decided March 26, 1998.

Michael G. Logan (argued), Carey M. Stein, Gary D. Ashman, Ashman & Stein, Chicago, IL, for Plaintiff–Appellant.

Kimball R. Anderson (argued), David E. Koropp, Winston & Strawn, Chicago, IL, for Defendant–Appellee.

Before ROVNER, DIANE P. WOOD, and EVANS, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Like many other workers in today's highly specialized world, Janet DePaoli had to perform repetitive motions on her assembly line job. As a result, she developed tendinitis and tenosynovitis in her right hand. She twice underwent surgery for the condition and asked her employer, Abbott Laboratories, to give her a job that accommodated her medical restrictions. Abbott looked for non-assembly line jobs for her, but, having found none after DePaoli had been on disability leave for a year, it terminated her. DePaoli sued Abbott, claiming that it had discriminated against her by failing to accommodate her disability, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and that it had violated Illinois common law by discharging her in retaliation for filing a workers' compensation claim. The district court granted summary judgment to Abbott on both counts, finding on the ADA claim that DePaoli had not established that she had a "disability" within the meaning of the Act. See *DePaoli v. Abbott Labs.*, 1996 WL 197685, at *9 (N.D.Ill. Apr. 22, 1996). She has appealed only the ADA count. Although we disagree with the district court's analysis of the "disability" requirement under the statute, we affirm the judgment for Abbott on other grounds.

## I

DePaoli worked as a production operator in one of Abbott's facilities, where she had an assembly line job that required her to place bottles on a conveyor belt. In early March 1992 she injured her hand during work. In June, she went on disability leave. Her treating physician, Dr. Anoo Patel, diagnosed her as suffering from "chronic tendinitis and tenosynovitis of the flexor tendons of the right hand, especially middle finger." As noted, she eventually had two operations on the hand. Afterwards, Dr. Patel concluded that, although the surgery had enabled her to regain a "good range of functions of the hand," she was unable to return to "the type of work she used to do at Abbott Laboratories." Dr. Henry W. Apfelbach, Abbott's workers' compensation doctor, essentially agreed, writing that:

[t]his patient has had surgery for stenosing tenosynovitis or ganglion of the tendon sheath to the right middle finger. It is my opinion that there is a cause and effect relationship with the patient's type of employment and the development of this condition.

I certainly feel this patient is capable of returning to gainful employment. I do not feel she is capable of doing repetitive motions of her hand but can use her right hand during the course of her employment. I do not feel that this patient's problem necessitates a lifting restriction.

With these opinions in hand, Abbott concluded that DePaoli's injury was one that "affected her ability to perform the essential functions of an assembly line, production job." DePaoli received disability benefits from June 16, 1992, until December 15, 1994, when her eligibility for benefits under Abbott's policy expired.

Following the second surgery, DePaoli's lawyer contacted Abbott's workers' compensation lawyer and requested that Abbott "accommodate" DePaoli's medical restrictions so that she could return to work. The Abbott attorney responded that Abbott was reviewing available job vacancies to accommodate her. Charlene Dibble, Abbott's Human Resources Manager, was supervising the review. Dibble recalled generally that someone had asked for an accommodation for DePaoli, but she otherwise remembered little about the case. Abbott's disability insurance carrier conducted a transferrable skills analysis, which concluded that DePaoli had the skills for four alternative jobs: (1) sales attendant; (2) office helper; (3) information clerk; and (4) answering service clerk. Under Abbott's Disability Leave of Absence Policy, DePaoli would be considered as an internal candidate for any available jobs for which she was qualified. In the end, however, Abbott did not offer DePaoli any alternative employment.

DePaoli contends that requisition forms prepared by Abbott reveal numerous job openings at the Lake County facility where

she had worked. (Although Abbott denies this, we take the facts on summary judgment in the light most favorable to DePaoli and thus assume that job openings existed.) Effective June 15, 1993, Abbott terminated DePaoli, based on its policy of terminating employees after they have been on disability leave for one year. (DePaoli had not taken advantage of an Abbott policy that permitted employees on disability leave who are released to work before the expiration of one year, but for whom no job has become available, to request an unpaid Personal Leave of Absence.) After her termination, DePaoli applied for a line production job at Johnson Wax. She also applied for a variety of other jobs, and as of the time of her deposition in January 1996, she worked as a sales associate at a furniture store.

This suit followed in due course, after DePaoli made the necessary complaint with the Equal Employment Opportunity Commission (EEOC) and it issued a right-to-sue letter on February 27, 1995. The district court concluded that DePaoli was not "disabled" as a matter of law. See *DePaoli*, 1996 WL 197685, at *9. It believed that her physical impairment had to "constitute a significant barrier to employment in general," correctly noting that it is not enough to show that one particular job is beyond reach. *Id.* at *7. It also found that DePaoli had failed to meet her burden of introducing evidence about the requirements, skills, or qualifications of other production line positions in the region. *Id.* It therefore granted summary judgment to Abbott on this count (as well as on the retaliation count, which is not before us). *Id.* at *9, 11.

## II

### A. *Was DePaoli "Disabled" for ADA Purposes?*

We agree that the first hurdle DePaoli had to clear was to show that she had a "disability" within the meaning of the ADA. See *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797–98 (7th Cir.1995) (prima facie ADA case). See also 42 U.S.C. § 12112 (prohibiting discrimination against a "qualified individual with a disability"). The Act defines "disability" as follows:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Proof of disability under subpart A involves three elements. First, borrowing from the regulations implementing the analogous Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, the EEOC has defined the term "physical or mental impairment" as:

(1) [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2)[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). Second, the term "major life activities," as we have noted in other ADA cases, means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* at § 1630.2(i). See also *Knapp v. Northwestern Univ.*, 101 F.3d 473, 480–81 (7th Cir.1996) (university's refusal to permit student-athlete with heart ailment to play NCAA basketball did not affect "major life activity" within meaning of Rehabilitation Act); *Homeyer v. Stanley Tulchin Assocs., Inc.*, 91 F.3d 959, 962 (7th Cir.1996) (ADA plaintiff with respiratory problems who claimed to suffer adverse effect from environmental tobacco smoke pleaded legally sufficient impairment of major life activity of "breathing"). Finally, the impairment must "substantially limit" one or more major life activities of the individual. 42 U.S.C. § 12102(2). A substantial limitation, according to the EEOC's regulations, is one that leaves the individual either unable to perform a major life activity, or significantly restricted "as to the condition,

manner or duration" of performance of that activity. See 29 C.F.R. § 1630.2(j)(1).

It is DePaoli's burden on summary judgment to come forward with evidence that indicates she could meet her ultimate burden of showing an ADA recognized disability. We have stated that this question is "an individualized one, and must be determined on a case-by-case basis." *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995) (citing *Byrne v. Board of Educ.*, 979 F.2d 560, 564 (7th Cir.1992)). It is undisputed (or at least, we take it to be so at the summary judgment stage) that DePaoli is suffering from a physiological disorder or condition that affects her musculoskeletal system— namely, her tendinitis and tenosynovitis. This, we assume for present purposes, is enough to show that she has a "physical impairment" as the term is used in 42 U.S.C. § 12102(2)(A) and 29 C.F.R. § 1630.2(h)(1). The more difficult question is whether her physical impairment substantially limits any of her major life activities. The only major life activity that might be affected, as the case comes to us, is the activity of working. Two general principles bound our analysis here. On one hand, as the district court recognized, it is not enough for an employee to show that her disability prevented her from performing one particular job. See *Knapp*, 101 F.3d at 481 (Rehabilitation Act); *Homeyer*, 91 F.3d at 961(ADA). Conversely, however, an employer cannot avoid liability by showing that the employee is still generally capable of doing some economically valuable work in the national economy, along the lines of the residual functional capacity test used in Social Security Act cases. See, *e.g.*, *Caldarulo v. Bowen*, 857 F.2d 410, 412–13 (7th Cir.1988) (describing the "sequential evaluation procedures" wherein claimant may be denied benefits depending on his "residual functional capacity to perform work existing in the national economy"); 20 C.F.R. § 404.1505 (definition of disability); 20 C.F.R. § 404.1545 (residual functional capacity). See also *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 487 (8th Cir.1996) (holding that an ADA disability analysis measuring plaintiff against all "other occupations in the general labor pool" was too broad); *Babb v. San Francisco Newspaper Agency*, 1996 WL 788377, at *2 (N.D.Cal. Oct. 16, 1996) (mere fact that employee could perform "several other jobs in the employer's company or outside the company" did not preclude finding of disability). The correct test falls somewhere in between those two extremes.

Unfortunately, as is the case with the term "disability," the statute itself sheds little light on what it takes to substantially limit the major life activity of working. We look therefore to the EEOC regulations, which offer some guidance:

> With respect to the major life activity of *working*—
>
> (i) The term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i) (emphasis in original). The regulation goes on to indicate a number of factors that may be considered in determining whether an individual is so limited, including (1) the geographic area to which the person has reasonable access, (2) both the job from which the individual has been disqualified, and the number and types of other jobs using similar training, knowledge, skills, and ability, from which the person is also disqualified, and (3) other jobs in the area that do not require the same training, knowledge, skills, and ability, from which the individual is also disqualified. *Id.* at § 1630.2(j)(3)(ii). The Appendix to Part 1630 also offers some useful examples of impairments that the EEOC believes fit the statutory requirements. Although it does not define the terms "class of jobs" or "broad range of jobs," it gives one example of each type of limitation:

> [A]n individual who has a back condition that prevents the individual from performing any heavy labor job would be substantially limited in the major life activity of working because the individual's impairment eliminates his or her ability to perform a class of jobs. This would be so

even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs. Similarly, suppose an individual has an allergy to a substance found in most high rise office buildings, but seldom found elsewhere, that makes breathing extremely difficult. Since this individual would be substantially limited in the ability to perform the broad range of jobs in various classes that are conducted in high rise office buildings within the geographical area to which he or she has reasonable access, he or she would be substantially limited in working.

29 C.F.R. Pt. 1630, App. § 1630.2(j).

■ Thus, in order to define a meaningful class of jobs, we must look to the training, knowledge, skills, and ability required to perform the particular work, as well as the geographic area reasonably available to the plaintiff. Common job groupings within a particular industry would also be relevant, just as they are in the somewhat analogous area of defining relevant markets in antitrust cases. If a disability substantially limits a person from holding a job for which she has a specialized license, and the person would need to undergo significant new training to become qualified for positions of comparable responsibility elsewhere, that fact too would help draw the line between the class of jobs relevant to the ADA and those that are too remote from the position at issue. So, for example, in *Best v. Shell Oil Co.*, 107 F.3d 544 (7th Cir.1997), this court found that the plaintiff had alleged enough to survive summary judgment when he presented evidence tending to show that his disability might preclude him from all truck drivers' jobs, not just the job he had done for Shell. *Id.* at 548. See also *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 911 (7th Cir.1996) (reasonable jury could have concluded that shoulder injury that interfered with heavy lifting, pulling, or pushing was disability disqualifying plaintiff from a broad range of work, not just his specific job).

■ In this case, the district court concluded at the summary judgment stage that DePaoli had failed to proffer evidence from which a reasonable jury could have concluded that her hand injury was a disability that would have prevented her from performing a class of jobs. See *DePaoli*, 1996 WL 197685, at *7–9; *DePaoli v. Abbott Labs.*, 1996 WL 400049, at *2 (N.D.Ill. July 15, 1996) (motion for reconsideration). We think that this conclusion was premature, for DePaoli's evidence indicates she was precluded from more than merely the Abbott production line job. For example, both Dr. Patel and Dr. Apfelbach agreed that she had become disabled from performing virtually any employment that required repetitive motions of her right hand. Although the hand was usable for less strenuous work, and there was no need to impose a weight lifting restriction on her, the doctors' opinions nevertheless indicate that she was precluded from a wide group of jobs in the Chicago area economy: virtually any assembly line job that required repetitive movement. Assembly line work is a recognized type of work in manufacturing plants, which requires different skills than those needed by, for example, the office staff, marketing, personnel, or research and development departments; it also typically has a pay scale that is distinct from those other lines of work. Although in some respects assembly line work might not be thought of as highly skilled, that just means that a greater number of people will possess the requisite training, knowledge, skills, and ability to perform it—not that assembly line work is not a recognized class of jobs under the ADA. Finally, as noted above, the EEOC's regulations give as an example of a person who has been precluded from a "class of jobs," someone with a back condition that impairs his ability to do heavy labor. DePaoli's tendinitis and tenosynovitis, we believe, follow the same pattern as that example. The Eighth Circuit came to a similar conclusion in a case with very similar facts, *Webb*, in which the plaintiff developed focal dystonia, a hand condition that made repetitive, precision work extremely painful for him. *Webb*, 94 F.3d at 486. That court remanded the case to the district court for a determination of what class of jobs the plaintiff no longer could perform. *Id.* at 488. Were this the only factor in our case, we would do the same. However, DePaoli faces a second hurdle that we have concluded, on our *de novo* review of

the summary judgment motion, she cannot surmount.

### B. *Was DePaoli a "Qualified Individual with a Disability"?*

██ DePaoli's case ultimately fails because she must do more than establish that she is disabled. She must also show that she was a "qualified" individual with a disability, meaning that she could perform the job either with or without reasonable accommodations. See 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(8). An employer would not, of course, be entitled to announce that the lack of any ADA disability was a "qualification" for a job, nor would it be entitled to create pretextual qualifications. *Cf. Miller v. Illinois Dept. of Corrections*, 107 F.3d 483, 485 (7th Cir.1997) (qualifications must be established for "valid" reason). However, because there are no allegations here that Abbott has engaged in such improper conduct, the statute directs us to focus on the employee's ability to perform the "essential functions" of the position. See 42 U.S.C. § 12111(8). Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, see *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124 (10th Cir.1995) and 29 C.F.R. Pt. 1630, App. § 1630.2(n), we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job. See *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 147 (1st Cir.1997) (inquiry into essential functions is not intended to second-guess employer's business judgment); *Riel v. Electronic Data Systems, Corp.*, 99 F.3d 678, 682 (5th Cir.1996) ("substantial deference" to be given to employer's written descriptions of "essential functions"); 42 U.S.C. § 12111(8) (consideration should be given to employer's written description of "essential functions"); 29 C.F.R. Pt. 1630, App. § 1630.2(n). *Cf. Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 678–79 (7th Cir.1998).

██ Our recent decision in *Matthews v. Commonwealth Edison Co.* makes clear that a worker has no claim under the ADA if she, even with a reasonable accommodation, cannot do the job for which she was hired. *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir.1997). "It is irrelevant that the lack of qualification is due entirely to a disability." *Id.* DePaoli must therefore show that, after her two rounds of surgery, she was qualified to perform the job of a production worker (assuming a generous definition of "class of job" for this purpose), either with or without accommodation. On this record, it is quite clear that she cannot perform her job without accommodation. The ability to use her hands in a repetitive way was the very essence of her job. In fact, DePaoli herself admits that she could no longer do the job without accommodation. Her theory of the case rests on this proposition, and she supports it with the medical advice of two doctors. Thus, because she could not perform the essential functions of the job in question, it is undisputable that she is not a "qualified" person, at least without accommodation.

The next question is whether DePaoli succeeds in shoehorning herself into the "with accommodation" branch of the statute, but here she faces an insurmountable problem. In fact, there is *no* accommodation that she has ever proposed that would permit her to perform the production worker job: no redesign of the work station, parking place, change in hours, or any of the other myriad accommodations people might need to compensate for a disability. What she wanted Abbott to do was to assign her to a completely different job. She has support in the statute for this theory, for the ADA itself states that:

[t]he term "reasonable accommodation" may include—

(B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B) (emphasis added). Relying on our decision in *Gile v. United Airlines, Inc.*, 95 F.3d 492 (7th Cir.1996), she

argues that this means Abbott had to offer her another position at the plant.

It is true that some of our prior opinions have spoken in general terms about the employer's duty to "ascertain whether he has some job that the employee may be able to fill." See *Miller*, 107 F.3d at 487; see also *Cochrum*, 102 F.3d at 913 (Cudahy, J., and Rovner, J., concurring) ("in an appropriate case, the ADA may require the employer to transfer the employee to another available job for which he or she is qualified"). Nevertheless, the court had no occasion in those cases to define with any precision the universe of jobs that the employer must consider. *Gile* is also inconclusive on the point. There, the accommodation the plaintiff requested would have involved working at the same general job, but on a different shift, or perhaps at a different location in the Chicago metropolitan area. *Gile*, 95 F.3d at 493. *Gile* was not requesting, and we did not hold, that United had a duty to offer employment in virtually the entire corporate enterprise. *Cf. id.* at 499 (carefully delineating when an employer is not obligated to provide reasonable accommodation by reassignment).

The present case, like *Dalton v. Subaru–Isuzu Automotive, Inc.*, (which we also issue today), requires us to elaborate further on the extent of the duty to accommodate by transfer to another job. See generally *Dalton*, 141 F.3d 667 (7th Cir.1998). As the *Dalton* opinion explains in greater detail, the duty under § 12111(9)(B) to "reassign[ ] to a vacant position" requires the employer to consider a reassignment to any position for which the employee satisfies the employer's legitimate, nondiscriminatory prerequisites, and for which the employee is capable of performing the alternative job's essential functions, with or without reasonable accommodations. *Id.*, 141 F.3d at 678. This has the effect of making the duty to transfer to another position roughly commensurate with the full class or range of jobs the employee is capable of performing. This does not mean that an enlightened employer is forbidden to waive its nondiscriminatory prerequisites, such as a prior experience requirement or a designation that a position is for temporary use only. See, *e.g.*, *Dalton*,

141 F.3d at 679 (citing examples of legitimate nondiscriminatory prerequisites). Indeed, the employer could adopt a policy like Abbott's, where a person will be considered for virtually every job in the company before termination. Nonetheless, the ADA affirmatively compels consideration of job reassignment to a vacant position only for the more restricted class of positions we describe here and in *Dalton*.

Unfortunately for DePaoli, even a liberal view of the other jobs to which she might have been transferred is of no help on this record. She concedes that she was no longer qualified to perform the production line work with or without accommodation (apart from a job transfer). Because she did not propose *any* alternative job for which she satisfied Abbott's prerequisites and whose essential functions she could perform, we conclude that Abbott was entitled to summary judgment. We therefore AFFIRM the judgment of the district court.

EVANS, Circuit Judge, concurring.

I agree with Judge Wood that Janet DePaoli's claim fails because she is not a "qualified individual with a disability." But I also think her claim fails because her condition— "chronic tendinitis and tenosynovitis of the flexor tendons of the right hand, especially middle finger"—does not make her "disabled" under the Act.

Ms. DePaoli, no doubt, has a "physical impairment." If the ADA defined a person with a "disability" simply as someone with a "physical or mental impairment" she would qualify for coverage. But to be considered "disabled," the Act requires more: one must be a person with "a physical or mental impairment which substantially limits one or more of such person's major life activities." Ms. DePaoli, who now works as a sales associate at a furniture store, cannot, in my opinion, satisfy the second half of the disability definition.