Debie D. ENGLAND, Plaintiff,

v.

ENBI INDIANA, INC., Defendant.

No. IP 98–0660–C–B/S.

United States District Court,
S.D.Indiana,
Indianapolis Division.

Jan. 14, 2000.

B. Gregory A. Stowers, Stowers Weddle & Henn, Indianapolis, IN.

J. Lee McNeely, NcNeely Stephenson Thopy & Harrold, Shelbyville, IN.

### ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Debie England ("England"), alleges that Defendant, ENBI Indiana, Inc. ("ENBI"), discriminated against her, in violation of Title I of the Americans With Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and the Indiana Workers Compensation Act, Ind.Code §§ 22–3–1–1 *et seq.* ("IWCA"). Specifically, England alleges that ENBI terminated her from her position as press operator because of her alleged disability, that ENBI failed to reasonably accommodate her alleged disability, and that her termination was in retaliation for England pursuing her rights under the IWCA. ENBI responds that: England is not disabled under the ADA; if she was disabled under the ADA she was not qualified for the press operator position; the accommodations sought by England were not reasonable; and there is no evidence to support her retaliation claim. ENBI requests Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, ENBI's motion must be *GRANTED.*

### *Factual Background*

England is a 38 year-old woman with no formal education beyond the ninth grade. *See* Pl.'s Statement of Additional Material Facts ("Additional Material Facts") ¶¶ 38, 39.[1] After working as a cook and at various other unskilled manual labor positions, England began working for ENBI on May 10, 1993. *See id.* ¶¶ 40, 41. England worked in ENBI's Assembly Grind Department for approximately twenty months before transferring in January, 1995, to become a press operator in ENBI's Press Department. *See id.* ¶¶ 41, 42. Except for periods where she was on light-duty as a result of the injuries discussed below, England continued as a press operator in the Press Department until the day she was put on lay-off status on April 23, 1997. *See* ENBI's Statement of Material Facts ("Material Facts") ¶ 33.

At the time England was placed on lay-off status, the Press Department consisted of approximately seventeen presses and employed eleven press operators on Eng-

---

1. In conjunction with her brief in opposition to ENBI's motion, as required by the Local Rules, England filed both a Plaintiff's Response to ENBI's Statement of Material Facts ("Response to Material Facts") and Additional Material Facts. *See* L.R. 56.1(f). Rule 56.1 requires us to assume as true without controversy: any factual assertion contained in ENBI's 56.1(f) submission that is properly supported and not specifically controverted by the Response to Material Facts and any factual assertion contained in the Additional Material Facts that is properly supported. L.R. 56.1(f)(2)(g). Our job of establishing the relevant disputed facts has been made easier by the parties' overall compliance with Local Rule 56.1.

land's shift. *See* Additional Material Facts ¶¶ 47, 57. These seventeen presses included five different press types: the Voltaire press, the LLF press, the Separator Pad press, the Book Mold press, and the Lexmark press. *See id.* ¶ 49. Presses are named after the different types of mold or material that they use; the Voltaire presses use a Voltaire mold, the Book Mold presses use a book mold. *See id.* ¶ 55. Although there were only five kinds of presses, some presses had multiple molds associated with them, for example, the Book Mold presses fit both a light and heavy mold and the Voltaire presses utilize five different loading trays, two of which are heavier than the others and weigh greater than twenty-five pounds. *See id.* ¶¶ 56, 89–90; Material Facts ¶ 25.

ENBI utilized a rotation system for staffing the presses within the Department, although the exact parameters of it are somewhat disputed by the parties. There is no dispute that the press operator position did not require any special skills or training. *See* Material Facts ¶ 2. Each worker was assigned to work a specific press for an entire shift. *See* Deposition of Debie England ("England Dep.") at 60–61. Each press utilized a mold that could change from day to day in size or type depending upon production needs. The worker loaded materials into the press and waited for a period of two to eight minutes while the press completed its function. *See* Additional Material Facts ¶¶ 59–60. This process is repeated ten to twelve times per shift, up to one hundred times a day. *See* England Dep. at 59. Lifting is an essential function of working any of the presses and some of the molds weighed more than fifteen pounds. *See* Material Facts ¶¶ 22, 25.

Of the five different press types, ENBI asserts that the press operator position required workers to rotate through four on a daily basis: the Voltaire press, the LLF press, the Separator Pad press, and the

Book Mold press. *See* Material Facts ¶¶ 20, 21.[2] ENBI utilizes this rotation for several reasons. One reason is to provide the flexibility that the Press Department needs to respond to changes in product demand. *See* Deposition of Julie Metz ("Metz Dep.") at 43. More importantly, press operators at ENBI face a high incidence of repetitive motion injuries and ENBI believes that the rotation system reduces the number of these injuries. *See id.*

England disputes ENBI's asserted rotation requirement for the press operator position. She appears to disagree with what presses were involved in the asserted rotation rather than whether ENBI required press operators to rotate among them. England points out that not all of the press operators were required to rotate to all of the presses. *See* Additional Material Facts ¶ 61. As we have previously noted, the Book Mold presses have two molds, one which is heavy and one which is light. *See id.* ¶ 56. Due to the weight of the heavy mold used in the Book Mold press, ENBI did not require any of its female press operators to work with the it, regardless of whether they were disabled or not. *See* Additional Material Facts ¶¶ 63–70; Deposition of Sandy Phares ("Phares Dep") at 11–12. ENBI concedes that the Book Mold presses utilizing the heavy mold were not a part of the alleged rotation. *See* Reply Brief of ENBI at 8. England also cites one press operator, Sandy Phares, who worked primarily with the LLF presses and the Voltaire presses only, rotating only twice over four months to work a light Book Mold press and never working on a Separator Pad press. *See* Additional Material Facts ¶¶ 66–69 (citing Phares Dep. at 5, 6, 9). However, Phares was a press operator for only four months and during that time had not been trained on the Separator Pad press; she began working on the Book Mold press once it came into her rotation. *See* Phares Dep.

---

**2.** The Lexmark press was typically worked exclusively by one press operator per shift instead of as part of the asserted rotation. *See* Additional Material Facts ¶ 46.

at 9–11. Although England has successfully established that the Book Mold press, utilizing the heavy mold, was not part of the general press operator rotation, it is undisputed that the general rotation for press operators, notwithstanding a minor deviation with respect to Phares, consisted of the Voltaire presses, the LLF presses, the Separator Pad presses, and the Book Mold presses, utilizing the light mold.

England's tenure as a press operator was marked by repeated injuries to her wrists and arms. *See* Material Facts ¶ 3; Additional Material Facts ¶ 71. In January, 1996, a Dr. Idler diagnosed England with bi-lateral carpal tunnel syndrome ("CTS") and informed England that she needed surgery on her right wrist, left wrist and elbow. *See* Additional Material Facts ¶¶ 72, 73. Dr. Idler performed surgery on her right wrist in late January, 1996, and performed surgery on her left wrist and elbow in March, 1996. *See id.* ¶ 74, 78; Material Facts ¶ 4, 7. Following each of these surgeries, England returned to ENBI with a temporary five-pound lifting restriction. *See* Material Facts ¶ 5, 8; Additional Material Facts ¶¶ 76, 77, 79.[3] In response to these restrictions, when England returned after the first surgery, ENBI placed her on a light-duty assignment, involving her sorting parts instead of working the press machines, and continued this assignment through several months after the second surgery. *See* Material Facts ¶ 6, 10; Additional Material Facts 78, 80. This light duty program is intended to be a temporary assignment, available to ENBI employees for up to twelve weeks. *See id.* ¶ 14.[4]

In May or June of 1996, Dr. Ingler released England to return to her regular press operator position without any lifting restrictions. *See* Additional Material Facts ¶ 81. However, after returning to work without restrictions, England once again experienced pain in her right elbow. *See id.* ¶ 82; Material Facts ¶ 9. In August, 1996, Dr. Idler performed a third surgery, this time on England's right elbow, after which she again returned to a light-duty assignment with a temporary five-pound lifting restriction. *See* Additional Material Facts ¶ 83, 84; Material Facts ¶ 9, 10. In October, 1996, the temporary restrictions were again lifted, and England returned to her regular job as a press operator. *See* Additional Material Facts ¶ 86; Material Facts ¶ 10.

Thereafter, although England experienced no pain while on light-duty assignments, upon her return to the press operator position, she began to feel the pain from her CTS and in December, 1996 reported to her doctor. *See* Additional Material Facts ¶ 87; Material Facts ¶ 11, 12. England believed that this pain resulted from her using the heavier loading trays, weighing more than twenty-five pounds, that were part of the Voltaire presses. *See* Additional Material Facts ¶ 88. This complaint prompted Dr. Idler to schedule England for a functional capacity evaluation by the Hand Rehabilitation Center for Working Hands ("Rehabilitation Center") in January, 1997, *see* Additional Material Facts ¶ 93, which it performed on January 14, 1997. *See* Metz Dep. Ex. D, Functional Capacity Evaluation ("Evaluation").

ENBI provided the Rehabilitation Center with a form describing the press operator position, a description that appears on the front of the functional evaluation form. *See* Additional Material Facts ¶¶ 122, 123.

---

**3.** The parties disagree about whether England returned to work after the first surgery in January or February 1996. *Compare* Material Facts ¶¶ 5, 6 (asserting that England did not return to work until February) *with* Additional Material Facts ¶ 76 (stating that England returned to work in January). This dispute is not important to the issue at hand and is thus immaterial.

**4.** England neither admits nor denies the assertion in Material Facts ¶ 14. *See* Response to Material Facts ¶ 14. Since this factual assertion was not specifically controverted or objected to, we assume England concedes it is without controversy. *See* L.R. 56.1(f)(3).

This description stipulates that the press operator is required to: "rotat[e] every two weeks ... lift 26 lb. maximum [and] once every hour carry 2 feet (10% of day), push/pull 100 lb 20 foot (5% of day), lift 1 lb ten times per hour, ...." Evaluation at 1.[5] The evaluation concludes that England is able to perform the press operator position with limited accommodations. *See* Additional Material Facts ¶ 124. Specifically, the evaluation finds that England meets ENBI's job requirements in all respects except for three tasks which the evaluation finds England able to perform with the following accommodations: (1) for the task "scrub plates" associated with the Voltaire press, the Rehabilitation Center suggests England "shift to left hand as needed;" (2) for the task "sort parts" associated with the Voltaire press, the Rehabilitation Center advises England get "rest break as needed; rate not necessary until end of day;" and (3) for the task "running a pallet jack" associated with the LLF press, the Rehabilitation Center proposes "fill load with less weight, 200 lb maximum." Evaluation at 5, 6. Interestingly, under the heading "specific job tasks," the evaluation lists only tasks associated with two types of presses. Notably absent from the specific job tasks, and left undiscussed by both parties, are the Book Mold press and the Separator Pad press.

Based upon the Rehabilitation Center's evaluation, Dr. Idler assigned to England a "15% partial impairment and a permanent 15 lb. weight lifting restriction on February 13, 1997." Additional Material Facts ¶ 94; Material Facts ¶ 15. This was apparently England's final communication with Dr. Idler. *See* Additional Material Facts ¶¶ 100, 102. Dr. Idler did, however, send a letter to ENBI in February, 1997 in which he told ENBI that England was continuing to have difficulties "lifting her trays ... [that] they weigh approximately 25 pounds, and she must lift this try [sic]

up to 100 times per day ... [that she] needs a 15 pound lifting restriction ... [and that] she qualifies for a 15 percent impairment of the right upper extremity below the elbow ...." Metz Dep., Ex. B, Letter from Dr. Richard S. Idler to Lorene Zolla, ENBI (Feb. 13, 1997) (cited by Material Facts ¶ 15; Additional Material Facts ¶ 121).

Although ENBI maintains that it initiated meetings and discussions with England regarding ways to accommodate the fifteen pound weight restriction, *see id.* ¶ 16, the parties do not agree as to what specific accommodation England actually sought. ENBI characterizes England's request as one that would have "allowed [her] to remain in her 'light duty' assignment, and that [would have] allowed [her] to work the Voltaire press with light loading boards" and further, that she be "permanently excluded from having to do the Book Mold press." *Id.* ¶¶ 18, 26. England agrees that she did ask to be excluded from the Book Mold press but claims that the only additional accommodation she sought was to be able to switch the heavier loading trays on the Voltaire presses for the light loading trays on the Voltaire presses. *See* Additional Material Facts ¶ 125. Thus, according to England, she was willing and able to all of the press-work except the Book Mold presses and lifting the heavy trays on the Voltaire presses.

After being informed of England's restrictions, ENBI contacted Sports Works, Inc., an ergonomic consultant, to evaluate the press operator position. *See* Material Facts ¶ 28. Unfortunately, the Sports Works evaluation was erroneously premised on ENBI's mischaracterization of England's requested accommodation, to wit, that her work be limited only to the Voltaire presses using the light loading boards.[6] Sports Works determined that

---

5. We confess we are confused about the precise meaning of this provision.

6. Julie Metz, the Manager of Administration at ENBI, was unclear why Sports Works' analysis singled out only one machine for England's use. *See* Deposition of Julie Metz

rotation by employees through the different work stations was necessary to reduce the risk of repetitive motion injury. *See id.* ¶ 30.[7] Although this rotation of employees was recommended, the details of such were not addressed: the report does not recommend the number or types of presses that the operators needed to rotate among or how frequently they needed to change machines.

In the face of these restrictions, England clearly cannot work at ENBI in any job to which an essential function of lifting in excess of fifteen pounds applies. *See* Material Facts ¶ 17. In fact, according to England, the fifteen pound lifting restriction limits her overall employment opportunities as well. Michael Blankenship, a Vocational Rehabilitation Specialist, analyzed all unskilled jobs in the greater Indianapolis area for June, 1999, and concluded that England's lifting restriction places her in the "sedentary" category of unskilled jobs. *See* Affidavit of Michael Blankenship ("Blankenship Aff.") ¶¶ 8, 9. Further, his review of the Unskilled Employment Quarterly, showed 108,300 unskilled jobs available in the greater Indianapolis area as of June, 1999, of which only 4,169 were within the sedentary classification. *See id.* ¶ 14. Blankenship opines that prior to the onset of CTS, England was qualified for all of the unskilled jobs in the greater Indianapolis area. *See id.* England's permanent restrictions therefore suggest that she can now work only 3.8% of the jobs for which she was previously qualified. *See id.* ¶ 15.

From December, 1996, until April, 1997, England unofficially performed her duties by utilizing the same accommodation that she officially had sought approval for from ENBI, by trading duties with a co-worker if she were assigned to work a Voltaire press using a heavy tray. *See* Additional Material Facts ¶ 91. England states that after she came off light duty in October, 1996, she does not recall ever having to work on a Book Mold press. *See id.* ¶ 97. In addition, England admits that she periodically needed assistance lifting items in excess of fifteen pounds, but asserts that "press operators routinely helped each other particularly with lifting." *Id.* ¶ 98. Having made these adjustments, England claims she was able to continue work as a press operator without any physical problems or a drop in productivity. *See id.* ¶¶ 92, 99.

England claims that things were working smoothly in the Press Department after making her adjustments until Metz contacted her on April 10, 1997, to inform her that ENBI was again placing her on light duty. *See id.* ¶ 101. In England's view, this change was made "for no apparent reason." *See id.* She had not complained of any pain nor had she consulted with Dr. Idler since December, 1996. *See id.* ¶¶ 100, 102. England asked Metz why she was being taken off her job and was told that, according to ENBI's lawyers, England "was a potential liability if she continued to work as a press operator." *Id.* ¶¶ 103, 104. When asked by England how she might be able to keep her current job, Metz allegedly said she would have "to have [her] doctor remove the 15 lb. weight lifting restriction." *Id.* ¶ 126. On April

---

at 30–33. According to Metz, the consultant was not told by either herself or England that this was the requested accommodation. *See id.* at 33

7. England disputes each of the assertions relating to the ergonomic consultant, though it is not clear what England is specifically disputing since her response merely states, "disputed," without any grounds for the objection or authority. *See* Response to Material Facts ¶¶ 28–31; L.R. 56.1(f)(3). ENBI's ergonomic consultant, who conducted its analysis on March 20, 1997, concluded that the rotation system described by ENBI would "reduc[e] the risk of cumulative trauma" and that the elimination of any one station within the rotation would increase the risk of cumulative trauma to other press operators. *See* Metz Dep. Ex. C at 2. England's denials do not rebut these facts and the Additional Material Facts portion of her submissions does not provide a basis to challenge ENBI's expert's opinions.

23, 1997, England was placed on lay-off status by ENBI until a position became available that satisfied the permanent work restriction assigned by her doctor. *See* Material Facts ¶¶ 15, 33. England says that she was told by Metz that she was being laid-off because she could no longer do her job as a press operator. *See* Additional Material Facts ¶ 105.

At the time England was laid off, in addition to the press operator position, ENBI also had production positions as "assembly grind," mill operator and "chain on edge," none of which were described to us. *See id.* ¶ 113. ENBI contends that England was no better able physically to perform any of these jobs than she was able to be a press operator and England provides no evidence to refute this contention. *See id.* ¶ 114. ENBI determined England could not return to her job as press operator, given her doctor's restrictions, and that no job accommodation was possible. *See* Material Facts ¶ 32.[8] After one year on lay-off status, ENBI terminated England's employment, pursuant to company policy. *See* Material Facts ¶ 34. Since the time of this termination, England has been employed by both General Devices in Indianapolis and KCL Corporation in production-related positions, although neither job required England to lift more than fifteen pounds as an essential function. *See id.* ¶¶ 35, 36; Additional Material Facts ¶ 120.

England filed her complaint in this action on May 15, 1998. ENBI has moved for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56.

## Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute that would preclude summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary

---

**8.** England disputes this assertion by ENBI. However, England's response once again merely "disputes" the assertion without providing any basis for it. *See* L.R. 56.1(f)(3). Based on the tenor of England's other assertions, we assume that she disputes that ENBI made any effort to consider an accommodation.

judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but required. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989).

## B. ADA Claim

The ADA was enacted by Congress to combat discrimination against disabled individuals. *See* 42 U.S.C. § 12101(b)(1). Congress chose to include within the ADA more than one method to combat this discrimination. One way the ADA provides protections to disabled individuals is by making it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual ...." § 12112(a). Thus, the ADA prohibits disparate treatment where an adverse employment decision, such as termination, is based upon a qualified individual's actual or perceived disability. *See, e.g., Weigel v. Target Stores*, 122 F.3d 461, 463–64 (7th Cir.1997) (citing §§ 12112(a), 12112(b)(3) and (4)). In addition, the ADA also prohibits an employer from failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. *See* § 12112(b)(5)(A); *Weigel*, 122 F.3d at 464.

These two types of claims require us to engage in different analyses. *See Weigel*, 122 F.3d at 464. For disparate treatment claims, the *McDonnell Douglas* burden-shifting framework employed in Title VII and ADEA actions is appropriate. *See id.* In failure to accommodate claims, the *McDonnell Douglas* framework is " 'unnecessary and inappropriate.' " *Id.* (quoting *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1284 (7th Cir. 1996)). "Accordingly it is important for

the plaintiff to be clear about the nature of the claim he or she is asserting." *Id.*

England asserts both a disparate treatment claim and a failure to accommodate claim arising out of the same conduct. Success on both types of ADA claims requires England first to prove that she is a qualified individual with a disability. *See Silk v. City of Chicago*, 194 F.3d 788, 798 & n. 6 (7th Cir.1999); *Ross v. Indiana State Teacher's Ass'n. Ins. Trust*, 159 F.3d 1001, 1013 (7th Cir.1998) (finding that ADA plaintiff bears the burden of establishing that he is a qualified individual with a disability); *Weigel*, 122 F.3d at 465 (finding that *McDonnell Douglas* prima facie requirements in ADA case must include a showing by plaintiff that he or she is a "qualified individual with a disability"); *Sieberns v. Wal–Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir.1997) (noting that a claim for failure to reasonably accommodate requires plaintiff first to prove that he was a qualified individual with a disability). Although England has successfully established that she is disabled, as defined by the ADA, she has failed to establish that she is a "qualified individual" with a disability, for the reasons explicated below.

### 1. Disability under the ADA.

Under the ADA, an individual is disabled if he (1) has a physical or mental impairment which substantially limits one or more of his major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. *See* 42 U.S.C. § 12102(b)(2); *DePaoli v. Abbott Lab.*, 140 F.3d 668, 671 (7th Cir. 1998). The Act itself sheds little light on the meaning of these terms, so courts routinely rely upon Equal Employment Opportunity Commission ("EEOC") regulations implementing Title I of the ADA to discern their meaning. *See* 29 C.F.R. § 1630 *et seq.; see also Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1151 (7th Cir.1998) (utilizing EEOC regulations to define "disability" under the ADA and finding summary judgment proper where

truck drivers failed to prove that their sleep impairments were disabilities). We do not understand ENBI to contest that England's CTS qualifies as a "physical impairment." Rather it focuses on whether she has successfully established that she is substantially limited in a major life activity. *See* ENBI's Memorandum In Support of Summary Judgment ("ENBI Memo") at 13.

EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limited" means, among other things, *"[s]ignificantly restricted* as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." § 1630.2(j) (emphasis added); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 506 (7th Cir. 1998) ("Not every impairment that affects a major life activity will be considered disabling; only if the resulting limitation is significant will it meet the ADA's test."). " 'Substantially' suggests 'considerable' or 'specified to a large degree.' " *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999).

■ Notwithstanding ENBI's contentions to the contrary, we are of the view that England has sufficiently established that she is substantially limited in her ability to perform the major life activity of working. To prove that her impairment disability is a substantial limitation on her ability to work, she must show that her disability significantly restricts her ability to perform a class of jobs or a broad range of jobs in various classes. *See Sutton,* 119 S.Ct. at 2150–51; *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999); *Skorup v. Modern Door Corp.,* 153 F.3d 512, 514 (7th Cir.1998); *Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1097 (7th Cir.), *cert. denied,* 525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998); *Davidson,* 133 F.3d at 506–07.

■ An impairment is not a disability within the meaning of the ADA if it merely renders an individual unable to perform a particular job for a particular employer. *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454–55 (7th Cir.1995); 29 C.F.R. § 1630.2(j)(3)(i). Rather, "the impairment must substantially limit employment generally." *See Byrne v. Board of Educ., Sch. of West Allis–West Milwaukee,* 979 F.2d 560, 565 (7th Cir.1992).[9] That is to say, the individual must be significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes. *See Weiler v. Household Fin. Corp.,* 101 F.3d 519, 525 (7th Cir.1996); 29 C.F.R. § 1630.2(j)(3)(i). Although it is inconsistent for a plaintiff to claim that his ability to work is substantially limited and simultaneously be employed in either the same position he was seeking or one similar to the position he was seeking, *see Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1197–98 (7th Cir.1997); *Korzeniowski v. ABF Freight Sys., Inc.,* 38 F.Supp.2d 688, 693 (N.D.Ill.1999), a defendant "cannot avoid liability by showing that the employee is still generally capable of doing some economically valuable work." *DePaoli,* 140 F.3d at 672.

---

**9.** Although *Byrne* was decided under the Rehabilitation Act of 1973, courts have applied Rehabilitation Act cases in interpreting the ADA. *See, e.g., Hedberg v. Indiana Bell Tel. Co.,* 47 F.3d 928 (7th Cir.1995). In fact, in enacting the ADA, Congress borrowed language from the Rehabilitation Act and indicated explicitly that the caselaw developed under the prior act would be generally applicable to analyzing the term "disability" under the ADA. *See Palmer v. Circuit Court of Cook County, Soc. Serv. Dep't,* 905 F.Supp. 499, 506 n. 7 (N.D.Ill.1995), *aff'd,* 117 F.3d 351 (7th Cir.1997), *cert. denied,* 522 U.S. 1096, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998).

One way for a plaintiff to show that she is substantially limited in her ability to work is to provide expert testimony that identifies the reduction in job opportunities available to the plaintiff due to the disability in question. In order for such an opinion to suffice it must compare the number of jobs the plaintiff could do before and after the onset of her disability, it must focus on the geographic region to which the plaintiff might turn for a job, and it must identify the time period for the statistics used. *See Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 675 (7th Cir.1998); *see also Bragg v. Tri Lite, Inc.*, 1999 WL 965419, No. 97–C–1138, at *6 (N.D.Ill. Sept. 30, 1999) (granting summary judgment where plaintiff produced no evidence indicating the geographic area to which she has access, the type of training and knowledge she has, or the number and types of jobs in the region requiring similar abilities from which she would be disqualified).

In *DePaoli*, the plaintiffs presented a vocational expert's testimony detailing the extent to which their respective disabilities limited their abilities to work. *See id.* at 675. Initially, the expert's report referenced the entire country, did not indicate the time frame upon which its conclusions were based, and did not distinguish the jobs available to the plaintiffs before and after the onset of their disabilities. *See id.* While these deficiencies prevented the plaintiffs' establishing that they were substantially limited in their ability to work, their case was salvaged by a supplemental opinion limited to the jobs then currently available in the local county and an indication of the numbers of jobs plaintiffs were qualified to work both before and after their disabilities, thus establishing that the plaintiffs' abilities to work had been substantially limited. *See id.* at 676.

The evidence provided by England in this litigation is very similar to the supplemental report filed by the vocational expert in *DePaoli.* England supplied the affidavit of Michael Blankenship, a Vocational Rehabilitation Specialist, who analyzed all unskilled jobs available in the greater Indianapolis area for June, 1999. *See* Blankenship Aff. ¶ 14. Although this area is broader than the single county utilized in *DePaoli*, this is the geographic region in which England was seeking employment. Likewise, although the dates analyzed by Blankenship do not correspond precisely to the date on which England was terminated by ENBI, looking at June, 1999, instead of April, 1998, we will permit England the benefit of a reasonable inference that the demographics for unskilled jobs available in greater Indianapolis did not change dramatically in that ensuing year, thus allowing England to survive summary judgment on this issue. Finally, Blankenship opines that prior to her disability, England would have been able to work in all of the 108,300 unskilled jobs available in the greater Indianapolis area, while, after developing CTS, she was qualified for only 4,169 of these jobs. *See id.* ¶ 14. Assuming the correctness of Blankenship's analysis, England has faced a 96.2% reduction in the range of jobs available to her due to her CTS, clearly a reduction sufficient to permit a finding that England is substantially limited in her ability to work.[10]

10. ENBI cites three recent Seventh Circuit opinions, all of which are clearly distinguishable from the case at bar. *See* ENBI Memo at 15 (citing *Skorup v. Modern Door Corp.*, 153 F.3d 512 (7th Cir.1998); *Baulos v. Roadway Express, Inc.*, 139 F.3d 1147 (7th Cir.1998); and *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499 (7th Cir.1998)). In both *Skorup* and *Davidson,* the plaintiffs provided no evidence of jobs from which they were precluded, aside from their jobs with the defendants from which they had been fired. *See Skorup,* 153 F.3d at 515; *Davidson* 133 F.3d at 506. In *Baulos,* the plaintiffs relied on only their individual opinions in establishing the number of jobs from which they were excluded due to their disability. *See Baulos,* 139 F.3d at 1152–53. Blankenship's data is considerably more probative than the speculations of *Baulos* or the lack of evidence in *Skorup* or *Davidson.*

Our conclusion is not altered by England's subsequent employment in production jobs at General Devices and KCL Corporation. Neither of these positions had as an essential function lifting up to fifteen pounds. *See* Additional Material Facts ¶ 120. Thus, they fall within the 3.8% of jobs still available to England after developing CTS. The fact that she was able to find such employment in no way changes our conclusion that she was substantially limited in her ability to work.

*2. Qualified individual under the ADA.*

Merely having a disability, however, is not sufficient to trigger the ADA's protections. The ADA protects only "qualified individual[s] with a disability." 42 U.S.C. § 12112(b)(2). The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds ...." § 12111(8). This definition requires that we first ascertain the "essential functions" of the press operator job and then determine whether England is capable of performing these functions with or without a "reasonable accommodation."[11]

The regulations define essential functions as the "fundamental job duties of the employment position the individual with a disability holds." 29 C.F.R. § 1630.2(n)(1). Evidence of whether a function is essential or not includes:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function; [and/or]

(iv) The consequences of not requiring the incumbent to perform the function . . . .

29 C.F.R. § 1630.2(n)(3). As a practical matter, "the employer is entitled to define the ... essential scope [of a job]." *Dalton,* 141 F.3d at 676. However, we must look to see whether the employer actually requires all employees in a particular position to perform the allegedly essential functions. *See DePaoli,* 140 F.3d at 674.

It is entirely proper and permissible for an employer to require as an essential function of a position the ability to rotate through a variety of specific duties. So long as the rotation requirement serves a legitimate business purpose, we will not second guess the employer's decision that the employees rotate through the various tasks. *See Miller v. Illinois Dep't of Corrections,* 107 F.3d 483, 485 (7th Cir.1997); *see also Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1176 (10th Cir.1999) (holding multiple job classification to be essential function of brewery production position where rotation to different parts of operation was required to respond to surges in demand for particular abilities); *Laurin v. Providence Hosp.,* 150 F.3d 52, 59 (1st Cir.1998) (finding shift rotation essential function for position as nurse in twenty-four hour hospital facility); *Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 700–01 (7th Cir.1998) (holding that the flexibility needed to allow newspaper to strictly adhere to its production and distribution schedules justified employer's requirement that all packaging employees be trained in multiple areas so that anyone could work on any given assignment if necessary).

ENBI asserts that its position of press operator has as an essential function the rotation by employees through various machines within the Press Department. The rotation requirement is amply supported by the evidence before us. The actual functioning of the Press Department shows that press operators rotated regu-

---

11. This analysis is intended to flow from a determination that England has satisfied the prerequisites of the press operator job. *See Dalton,* 141 F.3d at 676. However, because ENBI has not disputed England's satisfaction of these prerequisites, we will deem this element of the test satisfied.

larly onto different types of presses. England herself testified that she also rotated onto the various presses in the Department. ENBI described the press operator position to both the Rehabilitation Center and Sports Works as including a rotation ·system.

█ More specifically, ENBI claims that the rotation system required all female operators to work on the Book Mold presses, using the light mold only, the LLF presses, the Separator Pad presses, and the Voltaire presses, some of which required lifting in excess of fifteen pounds. ENBI advances two justifications for this rotation schedule—maintaining flexibility within the Press Department and reducing the high incidence of repetitive motion injuries from which press operators were prone to suffer. *See* Metz Dep. at 43. Sports Works' ergonomic analysis supports ENBI's conclusion, namely, that the rotation schedule utilized by ENBI successfully reduces the incidence of repetitive motion injuries. *See* Material Facts ¶ 30. The need for production flexibility to allow ENBI to meet customer demands and an interest in protecting the health of its employees are legitimate business reasons sufficient to justify the practice of employee rotation among all four machines, assuming that this rotation practice was actually required of all press operators.

ENBI's description of the rotation schedule is also supported by the undisputed evidence before us. The functioning of the Press Department requires the female press operators to rotate through the four different presses that ENBI includes within the rotation. Although the experience of one operator, Sandy Phares, deviated slightly from this pattern, it is explained by the fact that she had worked in the Department for only a short while and had not yet been trained on the Separator Pad press. *See* Phares Dep. at 9–11. Further, she had begun working with the Book Mold press, utilizing the light mold, as soon as it was introduced into her rotation.

*See id.* Moreover, Phares testified that had she remained a press operator, she would likely have been trained on the Separator Pad press as well. *See id.* at 10.

Although England contends that the Book Mold presses were infrequently used, this assertion, made as it is by England alone, does not create a disputed material fact. The frequency with which the Book Mold press molds were used in the past does not necessarily mean that future consumer demand for the Book Mold product will not increase. In the event demand for the Book Mold product increases, ENBI would necessarily expect the Press Department to be able to adjust its rotation to respond to the increased demand. Moreover, England's assessment of the situation cannot overcome the Seventh Circuit's teachings· that we not second-guess employers' characterizations of essential functions of various positions.

The only other supporting evidence that England can point to is the evaluation prepared by the Rehabilitation Center. Under the "specific tasks" section of their report, the.evaluation lists tasks associated only with the Voltaire and LLF presses, excluding the Separator Pad and Book Mold presses. *See* Evaluation at 5, 6. However, while the description of the press operator job set out on the front of the evaluation was admittedly written by ENBI, England does not enlighten us as to where the Rehabilitation Center obtained the list of specific tasks. England does inform us that her duties at ENBI included work on both the Separator Pad and Book Mold presses, which admission precludes any assertion now that these machines were not part of the press operator rotation.

Even if we were to exclude the Book Mold press from the rotation required of ENBI employees, England's claim that she was able to perform the essential functions of the press operator position still cannot succeed. England has admitted that she was unable to work on a Voltaire press, when two of the five load trays were

in place, because they weighed more than twenty-five pounds and were heavier than her work restrictions allowed. *See* Additional Material Facts ¶ 125; Material Facts ¶ 25; England Dep. at 55–57. England does not and cannot contend that managing all of the loading trays on a Voltaire press was not a part of the expected rotation. In fact, all the other press operators whose testimony she adduces worked with all of the Voltaire press trays. Instead, England references the fact that she previously had been able to "trade" with other press operators when she had been assigned to work a Voltaire press with a tray that was too heavy for her to lift. *See* England Dep. at 60. Obviously, the practice of trading trays became a means by which England attempted to avoid the necessity of performing an essential function of the press operator position, that is, working with all of the Voltaire press trays. Thus, England's inability to work on the Book Mold presses or manage several of the heavier trays associated with the Voltaire presses means that she could not perform all of the essential functions of an ENBI press operator without accommodation.

This leaves the possibility that England could have performed the essential functions with reasonable accommodation, which would still make her a "qualified individual with a disability." *See* 42 U.S.C. § 12111(8). England states that "[t]he only accommodation I asked for was to continue working my regular job as a press operator working all the presses except the Book Mold and being allowed to switch the heavier loading tray for lighter loading tray on the Voltaire." Additional Material Facts ¶ 125. Since we have already determined that the ability to work the Book Mold and Voltaire presses was an essential function of the press operator position, England's position is clear: she could have continued working the press operator position so long as ENBI modified the essential duties of that job.

However, the ADA does not require the elimination or alteration of essential duties as an accommodation for a disabled individual. *See Miller,* 107 F.3d at 485; *Baxter v. Northwest Airlines, Inc.,* 1998 WL 603121, No. 96–C–2060, at *7 (N.D.Ill. Sept. 4, 1998). We do not believe it is "reasonable" to require ENBI to make such an accommodation. England admits that she "cannot work at ENBI in any job which has as an essential function which requires lifting in excess of 15 pounds." Material Facts ¶ 17; Response to Material Facts ¶ 17. Because the press operator position includes as an essential function rotating through all four press types, as discussed above, some of which require England to lift in excess of fifteen pounds, the possibility that a reasonable accommodation would have allowed her to continue working as a press operator is foreclosed.

Finally, we address the possibility that ENBI, in order to accommodate her disability, could have reassigned England to a position in which she would have been qualified. Under the ADA, the employer's duty to reasonably accommodate a disabled employee includes reassignment to a vacant position for which she is qualified. *See Dalton,* 141 F.3d at 677; 42 U.S.C. § 12111(9)(B). However, the plaintiff bears the burden of demonstrating that a vacant position exists and that she is qualified for that position. *See McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1165 (7th Cir.1997). England has not satisfied this burden here. Although she cites other production jobs available at ENBI, she makes no effort to establish that she was qualified for any of them. *See* Additional Material Facts ¶ 113. In fact, the uncontroverted evidence is that England was not qualified to work any of the jobs which she had identified. *See id.* ¶ 114. Without a showing that ENBI had a position available to which England could have been transferred, we must conclude that there were no vacant positions to which ENBI could have transferred Eng-

land that would have made her a "qualified individual with a disability." Accordingly, England was not a qualified individual with a disability, as defined by the ADA.

### 3. Conclusion

We have determined that England was not a qualified individual with a disability and was not subject to the ADA's protections. Both of her ADA claims, therefore, fail as a matter of law. We therefore grant summary judgment in favor of ENBI as to Counts I and II.

### C. Pendent State Retaliation Claim.

Count III is a state law claim. While the ADA provides us subject matter jurisdiction over England's ADA claims, *see* 29 U.S.C. § 1132(e)(1), we may exercise supplemental jurisdiction over England's state law claim only if it is so related to her ADA claims "that they form part of the same case or controversy." 28 U.S.C. § 1367. Since we have granted summary judgment on both of England's ADA claims, the better course is for us to decline to exercise supplemental jurisdiction over her remaining state law claim. *See* § 1367(c)(3); *Alonzi v. Budget Constr. Co.*, 55 F.3d 331, 334 (7th Cir.1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir.1993); *Young v. Easter Enters., Inc.*, 915 F.Supp. 58, 72 (S.D.Ind. 1995). Accordingly, we follow ENBI's recommendation and dismiss without prejudice Count III of England's Complaint to allow her to proceed with it, if she chooses, in the proper state court forum.

### Conclusion

For the reasons discussed above, we *GRANT* Summary Judgment in favor of the Defendant with respect to Counts I and II and dismiss Count III without prejudice.